BLESSING, DIRECTOR, ARIZONA DEPARTMENT OF
ECONOMIC SECURITY *v.* FREESTONE ET AL.

No. 95–1441. Argued January 6, 1997—Decided April 21, 1997

330

*C. Tim Delaney,* Solicitor General of Arizona, argued the cause for petitioner. With him on the briefs were *Grant Woods,* Attorney General, *Carter G. Phillips, Richard D. Bernstein,* and *Adam D. Hirsh.*

*Marsha S. Berzon* argued the cause and filed a brief for respondents.

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, William Kanter,* and *Alfred Mollin.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Illinois et al. by *James E. Ryan,* Attorney General of Illinois, *Barbara A. Preiner,* Solicitor General, and *James C. O'Connell, Barbara L. Green-span,* and *James C. Stevens,* Special Assistant Attorneys General, and *Charles F. C. Ruff,* Corporation Counsel of the District of Columbia, and

JUSTICE O'CONNOR delivered the opinion of the Court.

This case concerns a lawsuit brought by five mothers in Arizona whose children are eligible to receive child support services from the State pursuant to Title IV–D of the Social Security Act, as added, 88 Stat. 2351, and as amended, 42 U. S. C. §§ 651–669b (1994 ed. and Supp. II). These custodial parents sued the director of Arizona's child support agency

by the Attorneys General for their respective jurisdictions as follows: *Jeff Sessions* of Alabama, *Bruce M. Botelho* of Alaska, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Pamela S. Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Thomas W. Corbett, Jr.,* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Charles Molony Condon* of South Carolina, *Mark Barnett* of South Dakota, *Charles W. Burson* of Tennessee, *Dan Morales* of Texas, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, *Christine O. Gregoire* of Washington, *William U. Hill* of Wyoming, *Malaetasi M. Togafau* of American Samoa, *Calvin E. Holloway, Sr.,* of Guam, and *Julio A. Brady* of the Virgin Islands; for the American Public Welfare Association et al. by *Diana L. Fogle;* for the Council of State Governments et al. by *Richard Ruda* and *Charles Rothfeld;* and for the National District Attorneys Association et al. by *John D. Krisor, Jr., John Kaye, Michael R. Capizi, John Ladenburg,* and *Michael McCormick.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Christopher A. Hansen, Steven R. Shapiro,* and *Erwin Chemerinsky;* for the Anti-Poverty Project of the Edwin F. Mandel Legal Aid Clinic of the University of Chicago Law School by *Gary H. Palm;* for the National Center for Youth Law et al. by *Leora Gershenzon, Martha Matthews,* and *Brian Paddock;* and for the National Women's Law Center et al. by *Regina G. Maloney, Nancy Duff Campbell, Elisabeth Hirschhorn Donahue,* and *Martha F. Davis.*

under Rev. Stat. § 1979, 42 U. S. C. § 1983, claiming that they had an enforceable individual right to have the State's program achieve "substantial compliance" with the requirements of Title IV–D. Without distinguishing among the numerous provisions of this complex program, the Court of Appeals for the Ninth Circuit held that respondents had such a right. We disagree that the statutory scheme can be analyzed so generally, and hold that Title IV–D does not give individuals a federal right to force a state agency to substantially comply with Title IV–D. Accordingly, we vacate and remand with instructions to remand to the District Court.

## I

This controversy concerns an interlocking set of cooperative federal-state welfare programs. Arizona participates in the federal Aid to Families with Dependent Children (AFDC) program, which provides subsistence welfare benefits to needy families. Social Security Act, Title IV–A, 42 U. S. C. §§ 601–617. To qualify for federal AFDC funds, the State must certify that it will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV–D of the Social Security Act, 42 U. S. C. §§ 651–669b (1994 ed. and Supp. II),[1] and will do so pursuant to a detailed plan that has been approved by the Secretary of Health and Human Services (Secretary). § 602(a)(2); see also § 652(a)(3). The Federal Government underwrites roughly two-thirds of the cost of the State's child support efforts. § 655(a). But the State must do more than simply collect overdue support payments; it must also establish a comprehensive system to establish paternity,

---

[1] After the Court of Appeals rendered its decision, Congress amended Title IV–D in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, 110 Stat. 2105. Except where otherwise noted, we refer to the amended version of Title IV–D throughout this opinion.

locate absent parents, and help families obtain support orders. §§ 651, 654.

A State must provide these services free of charge to AFDC recipients and, when requested, for a nominal fee to children and custodial parents who are not receiving AFDC payments. §§ 651, 654(4). AFDC recipients must assign their child support rights to the State and fully cooperate with the State's efforts to establish paternity and obtain support payments. Although the State may keep most of the support payments that it collects on behalf of AFDC families in order to offset the costs of providing welfare benefits, until recently it only had to distribute the first $50 of each payment to the family. 42 U. S. C. § 657(b)(1). The amended version of Title IV–D replaces this $50 pass-through with more generous distributions to families once they leave welfare. 42 U. S. C. § 657(a)(2) (1994 ed., Supp. II). Non-AFDC recipients who request the State's aid are entitled to have all collected funds passed through. § 657(a)(3). In all cases, the State must distribute the family's share of collected support payments within two business days after receipt. § 654b(c)(1).

The structure of each State's Title IV–D agency, like the services it provides, must conform to federal guidelines. For example, States must create separate units to administer the plan, § 654(3), and to disburse collected funds, § 654(27), each of which must be staffed at levels set by the Secretary, 45 CFR § 303.20 (1995). If a State delegates its disbursement function to local governments, it must reward the most efficient local agencies with a share of federal incentive payments. 42 U. S. C. § 654(22). To maintain detailed records of all pending cases, as well as to generate the various reports required by federal authorities, States must set up computer systems that meet numerous federal specifications. § 654a. Finally, in addition to setting up this administrative framework, each participating

State must enact laws designed to streamline paternity and child support actions. §§ 654(20), 666.

To oversee this complex federal-state enterprise, Congress created the Office of Child Support Enforcement (OCSE) within the Department of Health and Human Services (HHS). This agency is charged with auditing the States' compliance with their federally approved plans. Audits must occur at least once every three years, or more often if a State's performance falls below certain standards. § 652(a)(4). If a State does not "substantially comply" with the requirements of Title IV–D, the Secretary is authorized to penalize the State by reducing its AFDC grant by up to five percent. § 609(a)(8). The Secretary has interpreted "substantial compliance" as: (a) full compliance with requirements that services be offered statewide and that certain recipients be notified monthly of the support collected, as well as with reporting, recordkeeping, and accounting rules; (b) 90 percent compliance with case opening and case closure criteria; and (c) 75 percent compliance with most remaining program requirements. 45 CFR § 305.20 (1995). The Secretary may suspend a penalty if the State implements an adequate corrective action plan, and if the program achieves "substantial compliance," she may rescind the penalty entirely. 42 U. S. C. § 609(c) (1994 ed., Supp. II).

## II

Arizona's record of enforcing child support obligations is less than stellar, particularly compared with those of other States. In a 1992 report, Arizona's Auditor General chronicled many of the State's problems. In the 1989–1990 fiscal year, Arizona failed to collect enough child support payments and federal incentives to cover the administrative costs of its Title IV–D program—1 of only 10 States to fall below that target. Arizona Auditor General, A Performance Audit of the Arizona Department of Economic Security 2 (1992). The Auditor General also pointed out that the cost effectiveness

of Arizona's support enforcement efforts had been "minimal." For every dollar spent on enforcement, the State collected barely two dollars—almost half the nationwide average. *Ibid.* In 1992, nearly three-quarters of Arizona's 275,000 child support cases were still in the earliest stages of the enforcement process. In 42 percent of all cases, paternity had yet to be established. In a further 29 percent, the absent parent had been identified but his or her whereabouts were unknown. *Id.*, at 12. Overall, the Auditor General found that Arizona "obtains regular child support payments for fewer than five percent of the parents it serves." *Id.*, at 9.

Federal audits by OCSE have also identified shortcomings in Arizona's child support system. In several reviews of the State's performance from 1984 to 1989, the Secretary found that Arizona had not substantially complied with significant program requirements, and she repeatedly penalized the State one percent of its AFDC grant. The State developed a corrective action plan after each failed audit, which prompted the Secretary to suspend and—in every instance but one—waive the one-percent reduction in Arizona's AFDC funding.[2]

---

[2] For the deficiencies in Arizona's child support enforcement system, see principally OCSE, Audit Division Report No. AZ–85–PR, Program Results Audit of the State of Arizona Child Support Enforcement Program, October 1, 1984–September 30, 1985 (June 25, 1987); OCSE, Audit Division Report No. AZ–86–PR/PM, Program Results/Performance Measurements Audit, State of Arizona, Child Support Enforcement Program, October 1, 1985–September 30, 1986 (June 9, 1989); OCSE, Audit Division Report No. AZ–90–AA, Comprehensive Annual Audit, State of Arizona (Sept. 30, 1991) (covering calendar year 1989). Arizona eventually achieved substantial compliance in each category found deficient in these audits, although not always in a timely manner. See, *e. g.*, Letter from Jo Anne B. Barnhart, Assistant Secretary for Children and Families, Dept. of HHS, to Linda Moore-Cannon, Director, Arizona Dept. of Economic Security (Mar. 2, 1992) (reducing Arizona's AFDC funding by one percent for the period between July 1, 1988, and December 31, 1988, due to the State's failure to implement its Parent Locator Service in conformity with its corrective action plan).

Respondents are five Arizona mothers (some of whom receive AFDC benefits) whose children are eligible for Title IV–D child support services. They filed this lawsuit in the United States District Court for the District of Arizona against the Director of the Arizona Department of Economic Security, the state agency charged with providing child support services under Title IV–D. In a lengthy complaint, respondents claimed that they had properly applied for child support services but that, despite their good faith efforts to cooperate, the agency never took adequate steps to obtain child support payments from the fathers of their children. These omissions, respondents contended, were largely attributable to structural defects in the State's child support efforts: staff shortages, high caseloads, unmanageable backlogs, and deficiencies in the State's accounting methods and recordkeeping. App. 11, 14–16. Respondents sought to represent a class of all children and custodial parents residing in Arizona who are or will be entitled to Title IV–D services.

Respondents claimed that the State's systemic failures violated their federal rights under Title IV–D. Invoking 42 U. S. C. § 1983, they asked the District Court to grant them the following broad relief:

"Enter a declaratory judgment determining that operation of the Arizona Title IV–D program violates controlling, substantive provisions of federal law creating rights in plaintiffs and the class enforceable through an action permitted by 42 U. S. C. § 1983.

"Grant permanent (and as necessary and appropriate, interlocutory) injunctions prohibiting continued adherence to the aforesaid pattern and practices and requiring affirmative measures sufficient to achieve as well as sustain substantial compliance with federal law, throughout all programmatic operations at issue." App. 42.

The Director immediately moved to dismiss the complaint on several grounds, arguing primarily that Title IV–D cre-

ates no individual rights enforceable under § 1983. The District Court treated this motion as one for summary judgment and ruled in favor of the Director. Relying primarily on a decision of the Court of Appeals for the Sixth Circuit, *Carelli v. Howser*, 923 F. 2d 1208 (1991), the District Court held that Congress had foreclosed private actions to enforce Title IV–D by authorizing the Secretary to audit and cut off funds to States with programs that do not substantially comply with Title IV–D's requirements.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. 68 F. 3d 1141 (1995). The majority identified the three principal factors this Court has used to determine whether a statute creates a privately enforceable right: whether the plaintiff is one of the "intended beneficiaries of the statute," whether the plaintiffs' asserted interests are not so " 'vague and amorphous' as to be 'beyond the competence of the judiciary to enforce,' " and whether the statute imposes a binding obligation on the State. *Id.*, at 1147 (quoting *Wilder v. Virginia Hospital Assn.*, 496 U. S. 498, 509 (1990)). Title IV–D, the Court of Appeals held, satisfied each of these criteria. First, "needy families with children" were the intended beneficiaries of Title IV–D. 68 F. 3d, at 1150. Second, the majority held that the "plaintiffs' asserted interest is not vague or amorphous, and it is sufficiently concrete to be judicially enforceable" because whether a State delivers the services required by Title IV–D "to the degree required by law is judicially ascertainable." *Id.*, at 1149–1150. Finally, the Court of Appeals stated that the statute imposes binding obligations because a State must satisfy each of the requirements spelled out in Title IV–D in order to receive AFDC funding. Although the majority acknowledged that the requirement that a State remain in "substantial compliance" with its plan might seem ambiguous when divorced from context, the majority believed that the "highly detailed requirements" of the statute and its imple-

menting regulations adequately notified the State of the extent of its duties. *Id.*, at 1148. Moreover, the Court of Appeals noted that "the statute . . . sets forth detailed criteria for measuring compliance with the statute," for example, generally requiring States to establish paternity in a given percentage of all cases. *Id.*, at 1149 (citing 42 U. S. C. § 652(g)). Accordingly, the Court of Appeals concluded that respondents could sue petitioner under § 1983 to bring Arizona's child support enforcement program into substantial compliance with federal law. 68 F. 3d, at 1150.

The Court of Appeals also disagreed with the District Court's conclusion that Congress had implicitly foreclosed an individual remedy under § 1983 for violations of Title IV–D. The majority noted that Title IV–D includes no provisions for judicial enforcement that might supplant the § 1983 remedy. *Id.*, at 1153. Instead, the law simply gave the Secretary administrative oversight powers that were virtually indiscernible from those we had found insufficient to displace § 1983 liability in *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418 (1987). The majority expressed no opinion as to the appropriateness of either injunctive or declaratory relief, and left that question for the District Court to answer in the first instance. 68 F. 3d, at 1156.

Judge Kleinfeld dissented, arguing that Congress placed the power to enforce Title IV–D exclusively in the hands of the Secretary. He contended that the "'substantial compliance' standard does not 'unambiguously confer' enforceable rights on any individual." *Id.*, at 1157. At most, Title IV–D called upon States "to try pretty hard, and do a pretty good job, of enforcing child support, and come up with a plan to try harder if the Secretary thinks they have not been trying hard enough." *Ibid.*

We granted certiorari to resolve disagreement among the Courts of Appeals as to whether individuals may sue state

officials under § 1983 for violations of Title IV–D.[3]    517 U. S. 1186 (1996).

## III

Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."    We have held that this provision safeguards certain rights conferred by federal statutes.    *Maine* v. *Thiboutot*, 448 U. S. 1 (1980). In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.    Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106 (1989).    We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right.    First, Congress must have intended that the provision in question benefit the plaintiff.    *Wright*, 479 U. S., at 430.    Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that

---

[3] Compare *Wehunt* v. *Ledbetter*, 875 F. 2d 1558 (CA11 1989) (holding that Title IV–D was not enacted for the especial benefit of AFDC families, and so it does not create enforceable rights under § 1983), cert. denied, 494 U. S. 1027 (1990), with *Carelli* v. *Howser*, 923 F. 2d 1208 (CA6 1991) (holding that Title IV–D creates rights that are enforceable under § 1983, but that the Secretary's oversight power forecloses a § 1983 remedy), with *Albiston* v. *Maine Comm'r of Human Servs.*, 7 F. 3d 258 (CA1 1993) (holding that AFDC recipients have an enforceable right to prompt disbursement of their child support payments under Title IV–D), and with *Howe* v. *Ellenbecker*, 8 F. 3d 1258 (CA8 1993) (holding that Title IV–D creates rights that are enforceable under § 1983), cert. denied, 511 U. S. 1005 (1994).

Petitioner makes two further arguments in her briefs on the merits. She first contends that the Eleventh Amendment strips federal courts of jurisdiction over a § 1983 cause of action against state officials to enforce Title IV–D.    Next, she asks us to overrule *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), where we held that § 1983 provides a remedy for violations of federal statutes.    We decline to address these questions which were neither raised nor decided below, and were not presented in the petition for certiorari.    This Court's Rule 14.1(a).

its enforcement would strain judicial competence. *Id.*, at 431–432. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *Wilder, supra,* at 510–511; see also *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981) (discussing whether Congress created obligations giving rise to an implied cause of action).

Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress "specifically foreclosed a remedy under § 1983." *Smith* v. *Robinson,* 468 U. S. 992, 1005, n. 9 (1984). Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. *Livadas* v. *Bradshaw,* 512 U. S. 107, 133 (1994).

## A

With these principles in mind, we turn first to the question whether respondents have established that Title IV–D gives them federal rights.

In their complaint, respondents argued that federal law granted them "individual rights to all mandated services delivered in substantial compliance with Title IV–D and its implementing regulations." App. 41. They sought a broad injunction requiring the Director of Arizona's child support agency to achieve "substantial compliance . . . throughout all programmatic operations." *Id.,* at 42. Attributing the deficiencies in the State's program primarily to staff shortages and other structural defects, respondents essentially invited the District Court to oversee every aspect of Arizona's Title IV–D program.

Without distinguishing among the numerous rights that might have been created by this federally funded welfare program, the Court of Appeals agreed in sweeping terms that "Title IV–D creates enforceable rights in families in need of Title IV–D services." 68 F. 3d, at 1150. The Court of Appeals did not specify exactly which "rights" it was purporting to recognize, but it apparently believed that federal law gave respondents the right to have the State substantially comply with Title IV–D in all respects. We disagree.

As an initial matter, the lower court's holding that Title IV–D "creates enforceable rights" paints with too broad a brush. It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV–D, as an undifferentiated whole, gives rise to undefined "rights." Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights. See, e. g., *Golden State, supra,* at 106 (asking whether the "provision in question" was designed to benefit the plaintiff).

In prior cases, we have been able to determine whether or not a statute created a given right because the plaintiffs articulated, and lower courts evaluated, well-defined claims. In *Wright,* for example, we held that tenants of public housing projects had a right to have their utility costs included within a rental payment that did not exceed 30 percent of their income. We did not ask whether the federal housing legislation generally gave rise to rights; rather, we focused our analysis on a specific statutory provision limiting "rent" to 30 percent of a tenant's income. 479 U. S., at 430. Similarly, in *Wilder,* we held that health care providers had an enforceable right to reimbursement at "reasonable and adequate rates" as required by a particular provision in the Medicaid statute. 496 U. S., at 511–512. And in *Suter* v. *Artist M.,* 503 U. S. 347 (1992), where we held that Title

IV–E of the Social Security Act did not give the plaintiffs the right that they asserted, we again analyzed the claim in very specific terms: whether children had a right to have state authorities undertake "reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred." *Id.*, at 352 (footnote omitted). Finally, in *Livadas, supra,* at 134, we discerned in the structure of the National Labor Relations Act (NLRA) the very specific right of employees "to complete the collective-bargaining process and agree to an arbitration clause." See 512 U. S., at 133, n. 27 (explaining that whether a claim founded on the NLRA is cognizable under § 1983 may depend on whether the claim stems from abridgment of a "protected individual interest"). We did not simply ask whether the NLRA created unspecified "rights."

The Court of Appeals did not engage in such a methodical inquiry. As best we can tell, the Court of Appeals seemed to think that respondents had a right to require the Director of Arizona's child support agency to bring the State's program into substantial compliance with Title IV–D. But the requirement that a State operate its child support program in "substantial compliance" with Title IV–D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right. Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV–D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied. A State substantially complies with Title IV–D when it provides most mandated services (such as enforcement of support obligations) in only 75 percent of the cases reviewed during the federal audit period. 45 CFR § 305.20(a)(3)(iii) (1995). States must aim to establish paternity in 90 percent of all eligible cases, but may satisfy considerably lower targets so long as their

efforts are steadily improving. 42 U. S. C. § 652(g). It is clear, then, that even when a State is in "substantial compliance" with Title IV–D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet. Moreover, even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals. In short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of audits and reduce the State's AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights.

The Court of Appeals erred not only in finding that individuals have an enforceable right to substantial compliance, but also in taking a blanket approach to determining whether Title IV–D creates rights. It is readily apparent that many other provisions of that multifaceted statutory scheme do not fit our traditional three criteria for identifying statutory rights. To begin with, many provisions, like the "substantial compliance" standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations. These provisions may ultimately benefit individuals who are eligible for Title IV–D services, but only indirectly. For example, Title IV–D lays out detailed requirements for the State's data processing system. Among other things, this system must sort information into standardized data elements specified by the Secretary; transmit information electronically to the State's AFDC system to monitor family eligibility for financial assistance; maintain the data necessary to meet federal reporting requirements; and provide for the electronic transfer of funds for purposes of income withholding and interstate collections. 42 U. S. C. § 654a (1994 ed., Supp. II); 45 CFR § 307.10 (1995). Obviously, these complex standards do not

give rise to individualized rights to computer services. They are simply intended to improve the overall efficiency of the States' child support enforcement scheme.

The same reasoning applies to the staffing levels of the state agency, which respondents seem to claim are inadequate. App. 11 (Complaint ¶ 39) (alleging that delays in case processing are attributable to "extraordinary staff shortages, inordinately high caseloads and unmanageable backlogs"). Title IV–D generally requires each participating State to establish a separate child support enforcement unit "which meets such staffing and organizational requirements as the Secretary may by regulation prescribe." 42 U. S. C. § 654(3). The regulations, in turn, simply provide that each level of the State's organization must have "sufficient staff" to fulfill specified functions. These mandates do not, however, give rise to federal rights. For one thing, the link between increased staffing and the services provided to any particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV–D the right to have the State Department of Economic Security staffed at a "sufficient" level. Furthermore, neither the statute nor the regulation gives any guidance as to how large a staff would be "sufficient." Cf. *Suter*, 503 U. S., at 360 (finding requirement of "reasonable efforts" unenforceable where there was "[n]o further statutory guidance . . . as to how 'reasonable efforts' are to be measured"). Enforcement of such an undefined standard would certainly "strain judicial competence." *Livadas*, 512 U. S., at 132.

We do not foreclose the possibility that some provisions of Title IV–D give rise to individual rights. The lower court did not separate out the particular rights it believed arise from the statutory scheme, and we think the complaint is less than clear in this regard. For example, respondent Madrid alleged that the state agency managed to collect some support payments from her ex-husband but failed to pass

through the first $50 of each payment, to which she was purportedly entitled under the pre-1996 version of § 657(b)(1). App. 13 (Complaint ¶ 48). Although § 657 may give her a federal right to receive a specified portion of the money collected on her behalf by Arizona, she did not explicitly request such relief in the complaint.

In any event, it is not at all apparent that respondents sought any relief more specific than a declaration that their "rights" were being violated and an injunction forcing Arizona's child support agency to "substantially comply" with all of the provisions of Title IV–D. We think that this defect is best addressed by sending the case back for the District Court to construe the complaint in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting. Only by manageably breaking down the complaint into specific allegations can the District Court proceed to determine whether any specific claim asserts an individual federal right.

B

Because we leave open the possibility that Title IV–D may give rise to some individually enforceable rights, we pause to consider petitioner's final argument that no remand is warranted because the statute contains "a remedial scheme that is 'sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Wilder,* 496 U. S., at 521 (quoting *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1, 20 (1981)). Because petitioner does not claim that any provision of Title IV–D expressly curtails § 1983 actions, she must make the difficult showing that allowing § 1983 actions to go forward in these circumstances "would be inconsistent with Congress' carefully tailored scheme." *Golden State,* 493 U. S., at 107 (citation and internal quotation marks omitted).

Only twice have we found a remedial scheme sufficiently comprehensive to supplant § 1983: in *Sea Clammers, supra,* and *Smith* v. *Robinson,* 468 U. S. 992 (1984). In *Sea Clammers,* we focused on the "unusually elaborate enforcement provisions" of the Federal Water Pollution Control Act, which placed at the disposal of the Environmental Protection Agency a panoply of enforcement options, including noncompliance orders, civil suits, and criminal penalties. 453 U. S., at 13. We emphasized that several provisions of the Act authorized private persons to initiate enforcement actions. *Id.,* at 14, 20. We found it "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions." *Id.,* at 20. Likewise, in *Smith,* the review scheme in the Education of the Handicapped Act permitted aggrieved individuals to invoke "carefully tailored" local administrative procedures followed by federal judicial review. 468 U. S., at 1009. We reasoned that Congress could not possibly have wanted parents to skip these procedures and go straight to court by way of § 1983, since that would have "render[ed] superfluous most of the detailed procedural protections outlined in the statute." *Id.,* at 1011.

We have also stressed that a plaintiff's ability to invoke § 1983 cannot be defeated simply by "[t]he availability of administrative mechanisms to protect the plaintiff's interests." *Golden State, supra,* at 106. Thus, in *Wright,* we rejected the argument that the Secretary of Housing and Urban Development's "generalized powers" to audit local public housing authorities, to enforce annual contributions contracts, and to cut off federal funding demonstrated a congressional intention to prevent public housing tenants from using § 1983 to enforce their rights under the federal Housing Act. 479 U. S., at 428. We reached much the same conclusion in *Wilder,* where the Secretary of Health and Human Services

had power to reject state Medicaid plans or to withhold federal funding to States whose plans did not comply with federal law. 496 U. S., at 521. Even though in both cases these oversight powers were accompanied by limited state grievance procedures for individuals, we found that § 1983 was still available. *Wright, supra,* at 427–428; *Wilder, supra,* at 523.

The enforcement scheme that Congress created in Title IV–D is far more limited than those in *Sea Clammers* and *Smith.* Unlike the federal programs at issue in those cases, Title IV–D contains no private remedy—either judicial or administrative—through which aggrieved persons can seek redress. The only way that Title IV–D assures that States live up to their child support plans is through the Secretary's oversight. The Secretary can audit only for "substantial compliance" on a programmatic basis. Furthermore, up to 25 percent of eligible children and custodial parents can go without most of the services enumerated in Title IV–D before the Secretary can trim a State's AFDC grant. These limited powers to audit and cut federal funding closely resemble those powers at issue in *Wilder* and *Wright.* Although counsel for the Secretary suggested at oral argument that the Secretary "has the same right under a contract as any other party to seek specific performance," Tr. of Oral Arg. 49, this possibility was not developed in the briefs. Even assuming the Secretary's authority to sue for specific performance, Title IV–D's administrative enforcement arsenal would not compare to those in *Sea Clammers* and *Smith,* especially if, as the Government further contended, see Tr. of Oral Arg. 49–50, no private actor would have standing to force the Secretary to bring suit for specific performance. To the extent that Title IV–D may give rise to individual rights, therefore, we agree with the Court of Appeals that the Secretary's oversight powers are not comprehensive enough to close the door on § 1983 liability. 68 F. 3d, at 1151–1156.

## · IV

The judgment of the Court of Appeals is vacated, and the case is remanded with instructions to remand to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE KENNEDY joins, concurring.

I agree with the Court that under the test set forth in *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 423 (1987), and *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498, 509 (1990), 42 U. S. C. § 1983 does not permit individual beneficiaries of Title IV–D of the Social Security Act, as added, 88 Stat. 2351, and as amended, 42 U. S. C. §§ 651–669b (1994 ed., Supp. II), to bring suit challenging a State's failure to achieve "substantial compliance" with the requirements of Title IV–D. That conclusion makes it unnecessary to reach the question whether § 1983 *ever* authorizes the beneficiaries of a federal-state funding and spending agreement—such as Title IV–D—to bring suit.

As we explained in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), such an agreement is "in the nature of a contract," *id.*, at 17: The State promises to provide certain services to private individuals, in exchange for which the Federal Government promises to give the State funds. In contract law, when such an arrangement is made (A promises to pay B money, in exchange for which B promises to provide services to C), the person who receives the benefit of the exchange of promises between the two others (C) is called a third-party beneficiary. Until relatively recent times, the third-party beneficiary was generally regarded as a stranger to the contract, and could not sue upon it; that is to say, if, in the example given above, B broke his promise and did not provide services to C, the only person who could enforce the promise in court was the other party

to the contract, A. See 1 W. Story, A Treatise on the Law of Contracts 549–550 (4th ed. 1856). This appears to have been the law at the time § 1983 was enacted. See Brief for Council of State Governments et al. as *Amici Curiae* 10–11, and n. 6 (citing sources). If so, the ability of persons in respondents' situation to compel a State to make good on its promise to the Federal Government was not a "righ[t] . . . secured by the . . . laws" under § 1983. While it is of course true that newly enacted laws are automatically embraced within § 1983, it does not follow that the question of what rights those new laws (or, for that matter, old laws) *secure* is to be determined according to modern notions rather than according to the understanding of § 1983 when it was enacted. Allowing third-party beneficiaries of commitments to the Federal Government to sue is certainly a vast expansion.

It must be acknowledged that *Wright* and *Wilder* permitted beneficiaries of federal-state contracts to sue under § 1983, but the argument set forth above was not raised. I am not prepared without further consideration to reject the possibility that third-party-beneficiary suits simply do not lie. I join the Court's opinion because, in ruling against respondents under the *Wright/Wilder* test, it leaves that possibility open.