**EVERGREEN PRESBYTERIAN MINISTRIES, INC., et al.,**

v.

**Mr. David W. HOOD, Secretary of Louisiana Department of Health and Hospitals.**

Civil Action Nos. 00–306, 00–461, 00–515 and 00–547.

United States District Court, W.D. Louisiana, Lafayette–Opelousas Division.

June 14, 2000.

Nicholas Gachassin, Jr., Richard A. MacMillan, Gachassin & Hunter, Michael M. Meunier, Christopher C. Johnston, Michael R. Schulze, Stephen M. Sullivan, Sullivan Stolier & Resor, New Orleans, LA, Normand Francis Pizza, Robert L. Cabes, Peter M. Meisner, Alanna S. Arnold, Milling Benson Woodward Hillyer Pierson & Miller, New Orleans, LA, Gary J. Ortego, Office of Gary J. Ortego, Ville Platte, LA, Jonathan C. Vidrine, West & Vidrine, Ville Platte, LA, Angela W. Adolph, Baton, Rouge, LA, for Plaintiffs.

Francisco H. Perez, Stephen R. Russo, Richard L. Henley, Louisiana Dept. of Health & Hospitals, Baton Rouge, LA, Charles Miller, Anna Engh, Covington & Burling, Washington, DC, for Defendant.

*REASONS FOR JUDGMENT*

HAIK, District Judge.

On February 18, 2000, Evergreen Presbyterian Ministries filed a Complaint for Preliminary Injunction, Permanent Injunction, and Declaratory Relief, followed by an Application for Temporary Restraining Order filed on March 1, 2000. Consolidated with this matter were the following: Louisiana Nursing Home Association, filed on March 8, 2000; Calcaseiu Association of Retarded Citizens, Inc., et al, filed on March 15, 2000; and Doctors Hospital of Opelousa et al on March 20, 2000 all filed against the original defendant, David W. Hood. Numerous Temporary Restraining Orders were issued in the referenced matters. They are as follows: Evergreen Presbyterian Ministries—March 2, 2000; Louisiana Nursing Home Association—March 16, 2000; Doctors Hospital of Opelousas—March 23, 2000. A hearing was held on May 4, 2000 at which time plaintiffs' request for a preliminary injunction was granted.

**A. Facts**

The Medicaid program was established pursuant to Title XIX of the Social Security Act (42 USC § 1396, et seq.). The Louisiana program is jointly financed with the state providing approximately thirty percent (30%) and the federal government financing approximately seventy percent (70%) of the expenditures. A budgetary shortfall in the Medicaid program was predicted for the 1999–2000 fiscal year which caused the Department of Health and Hospitals to initiate reductions in the Medicaid program.

David W. Hood is the Secretary of the Louisiana Department of Health and Hospitals, an agency within the executive branch of the state government. The LDHH projected the shortfall in the budget to be approximately $126,000,000. Additionally, Governor Foster, by executive order, required LDHH to reduced expenditures by $22,500,000 in state general

funds, with approximately $16,000,000 of this figure to be cut from Medicaid. When combined with the federal funds, the cuts amounted to approximately $52,500,00. The total amount of the proposed cuts was approximately $180,000,000, representing approximately 5% of the State Medicaid Budget. LDHH devised a spending reduction plan and emergency rules were invented. The methods undertaken and the question of compliance with federal regulations lead to the case at hand.

## B. Plaintiffs' Contentions

Plaintiffs contend that, although participation in the Medicaid program is voluntary, a state electing to do so must comply with federal regulations, namely 42 USC 1396, et seq. Plaintiffs propose that the projected shortfall was reported to the Joint Legislative Committee on the Budget on December 3, 1999 and a Memorandum from defendant dated January 24, 2000 advised the Committee of the spending reduction program.

Plaintiffs claim that defendant started publishing a series of notices beginning January 25, 2000 which invited comment on the proposed emergency rules which were to take effect beginning on March 1, 2000 enacting numerous reductions, including a seven percent (7%) across the board cut in some Medicaid programs. Plaintiffs claim the publication did not include the methodology upon which the reductions were chosen, the new rates, or the justification for such as intended by section 4711 of the Balanced Budget Act of 1997. Additionally, plaintiffs claim the public process engaged in by defendant is deficient because meaningful comment from those parties affected was not permitted, noting that defendant advised in correspondence to the Joint Legislative Committee on the Budget that no other alternatives should be considered.

Plaintiffs further allege that the result of a state Public Records Act request submitted to defendant requesting all documents, studies, reports and finding regarding the sufficiency of the rates for efficiently and economically run non-state hospitals, nursing facilities, and Intermediate Care Facilities for mentally retarded individuals (ICFMRs) concluded that there were no such documents in existence which justified the proposed reductions for non-state hospitals or ICFMRs. Plaintiffs claim the analysis for reductions in rates for nursing facilities was "legally deficient".

Plaintiffs specifically alleged violations of 42 USC § 1396a(a)(30)(A), the "equal access" provision of the Social Security Act, 42 USC § 1396a(a)(13)(A), the "public process" provision (applying to only institutional providers), 42 USC § 1396a(a)(19), and 42 USC § 1396a(a)(33), Constitutional violations, as well as state law violations. Plaintiffs claim they are entitled to redress under 42 USC § 1983 for threatened violation of their civil rights under 42 USC § 1396. It should be noted that plaintiffs set forth various claims which were not the focus of these injunctive proceedings.

## C. Defendant's Contentions

Defendant contends that plaintiffs do not have a right to bring any claims pursuant to 42 USC § 1983 or 28 USC § 2201. Defendant claims that the repeal of the Boren amendment clearly showed Congress' intent to foreclose all section 1983 actions pursuant to any alleged violation of 42 USC § 1396a. Additionally, defendant argues that there is no private right of action under section 1983 for violations of section 1396a since the repeal of the Boren amendment. The Boren Amendment was replaced with 42 USC § 1396a(a)(13)(A), the "public process" requirement. Based upon this, defendant argues that the plaintiffs can not show a likelihood of success on the merits.

Additionally, the defendant argues that section 1396 may not even apply to the situation at hand as the rates in question are interim rates which are effective for only 120 days. These rates published by emergency rule do not fall under section 1396's requirements, according to the defendant. He argues that the uncertainty

in the statute's language makes it unclear if the statute deals only with rates prior to final rates created in regular rulemaking. Defendant argues that enforcement of section 1396a is left to DHHS and HCFA and is not a right belonging to plaintiffs under section 1983.

In addition to claiming plaintiffs have no right of action, the defendant argues that any rights under section 1396a(a)(13)(A) do not pass the analysis set forth in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) when determining if a right exists under section 1983, as the language of the statute is too "vague and amorphous" for the second prong to be satisfied. Alternatively and additionally, defendant argues that he has complied with the "public process" requirement set forth in the statute. Defendant argues that LDHH used a modified emergency rulemaking process which called for at least a thirty day comment period followed by regular rulemaking procedures under the APA. Defendant claims the publications included notice that the rate would be reduced seven percent (7%) or the rate itself, reference as to where the methodology could be found, and the justification for the change. Additionally, defendant claims there was ample time for comment. Defendant also believes that the twelve rules which are believed to be subject to the requirement of public process were published in a manner which complied with the statute.

Defendant argues that noting the percentage of reduction rather than the actual numbers was more informing to the public. Also, defendant notes that a reference as to where the methodology and justification could be found was included. Post–Boren amendment arguments similar to those referenced above were set forth to support the contention that plaintiffs have no redressable right under section 1983 for violations of section 1396a(a)(30)(A), (a)(19), or (a)(33) either and that said sections were not violated. Defendant claims that, through the repeal of the Boren amendment, Congress sought to make rate setting a state function, removing federal courts from the process. Further, defendant denies that the reductions will have any great effect on the facilities themselves and the care they are able to provide.

Additionally, defendant denies any Constitutional violations and argue that this Court lacks subject matter jurisdiction over the entire matter. Defendant claims that there is no federal question based upon the above arguments and, therefore, only state law claims remain.

## ANALYSIS

 42 USC § 1983 does not provide substantive rights, but does give an avenue by which rights arising from other sources may be pursued. According to 42 USC § 1983,

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The United States Supreme Court in, *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), set forth a three prong analysis to be used when determining whether a right exists under section 1983. First, Congress must have intended that the provision in question benefit the plaintiffs. Second, the plaintiff must demonstrate that the right which is asserted to be protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the states. In order to seek redress under section 1983, a plaintiff must assert a violation of a federal right, not merely a federal law.

The provisions of the Medicaid statute which have been focused upon, namely the "public process" provision (Section 4711 of the Balanced Budget Act of 1997) and the "equal access provision" (42 USC § 1396a(a)(30)(A)) are in place to benefit the plaintiffs. When a state chooses to participate in a Medicaid program and receive funds from the federal government, the state must administer that program in compliance with the laws governing such. The plaintiffs are entitled to rely upon the state of Louisiana to do so and are entitled to protect any rights given to them by such statute.

When a state changes its rates of payment to providers, Section 1396a applies. The statute clearly states that a state plan for medical assistance must

"provide for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which (i) proposed rates, the methodologies underlying the establishment of such rates, and justification for the proposed rates are published; (ii) providers, beneficiaries, and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications; (3) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and (iv) in the case of hospitals, such rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs."

■ Providers have a right to a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications for rate changes. Had the statute meant to distinguish between the types of rates to which these requirements would apply, it would have done so. As it did not, the requirements set forth in 1396a apply to all rates of payment, whether intermediary or otherwise. This section clearly benefits the plaintiffs in this action,

satisfying the first prong of the *Blessing* analysis.

■ Additionally, the "equal access" provision requires that the state must

"provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under that plan at least to the extent that such care and services are available to the general population in the geographic area".

This provision protects beneficiaries and their access to medicaid care. As this Court agrees with those decisions which have found providers to be "beneficiaries" under the equal access portion of the statute, it finds that this section is intended to benefit various parties, including providers such as the plaintiffs in this case. Further, this Court agrees with the Seventh Circuit's *Methodist Hospitals, Inc. v. Sullivan*, 91 F.3d 1026 ruling wherein that Court followed the Eighth Circuit's *Arkansas Medical Soc. v. Reynolds*, 6 F.3d 519 (8th Cir.1993) determination that providers have a private right of action, derived through section 1983, to enforce the equal access provision of the Medicaid statute.

The second prong of the *Blessing* analysis has also been satisfied in that the public process and equal access rights are not so vague and amorphous that judicial competence would be strained in the enforcement of such. Plaintiffs set forth a detailed and specific claim that their federal rights under both the equal access and public process sections of the Medicaid statute were violated through the defendants promulgation of the proposed rates in an emergency rule without adequately assuring the rates would not affect access to medical care and without providing for a public process which allowed plaintiffs a

reasonable opportunity to review the changes and participate. Plaintiffs have cited various failures on the defendant's part to comply with express requirements of the Medicaid statute. Judicial competence would in no way be strained through the enforcement of plaintiffs' statutory rights.

Finally, the third prong of the *Blessing* analysis calls for the statute to "unambiguously impose a binding obligation on the States". The language of the Medicaid statute itself satisfies this final requirement in that it begins with the language, "A state plan for medical assistance must ..." The Act, through 42 USC 1396a(a)(13)(A), requires a public process which includes the publishing of proposed rates, methodologies, and justifications. In addition, this section mandates that parties such as the plaintiffs in this case are given a "reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications", as well as considering the situation of hospitals which "serve a disproportionate number of low income patients with special needs". 42 USC § 1396a(a)(30)(A) also imposes an obligation on the state to ensure equal access to medical care under Medicaid. The obligations imposed in the Medicaid statute are unambiguous and mandatory. Therefore, with all elements of the analysis met, it is concluded that plaintiffs have a right of action under section 1983 for violations of section 1396a.

■ Based upon the above analysis and conclusion, it is determined that this Court has subject matter jurisdiction over this matter as this case involves a question of both federal and Constitutional law. There have been various claims asserted by plaintiffs which appear to have merit and the issues therein reach beyond state law and into the federal venue.

■■ The Fifth Circuit has concluded that, in order to secure preliminary injunctive relief, a party must prove certain factors. They are as follows: a substantial likelihood of success on the merits; a substantial threat of irreparable injury unless the injunction issues; the threatened injury to movant outweighs any damage the proposed injunction may cause the opposing party; the injunction will not disserve the public interest.

■ Plaintiffs have set forth case law and evidence which support a substantial likelihood of a violation of section 1396a(a)(30)(A). Plaintiffs rely heavily on the Eighth Circuit *Arkansas Medical Society v. Reynolds* decision, which struck down proposed rates in a similar situation, finding a violation of the equal access requirements of section 30(A) due to the reductions being based mainly on budgetary concerns. The Medicaid Act mandates consideration of the equal access factors of efficiency, economy, quality of care, and access to services in the process of setting or changing rates of payment. There is no set method or procedure for making the evaluations, but all of the statutory factors must be considered when changing rates.

Through their deposition testimony, numerous individuals involved in the process of reducing the Medicaid rates in the instant case noted that the primary, and possibly sole, reason for the reduction was the budgetary shortfall. For example, in his deposition, Thomas Collins, former State Medicaid Director, stated the following:

"Q: Well, since the cost has to be—the rate has to be consistent with the cost of economically and efficiently operated providers, how did you determine that a 7% reduction would be consistent with that cost?

A: We did not." (Depo., Thomas Collins, 3/14/00, p. 15)

He further answered, in response to a question of what impact the new rates would have and whether the rate would be consistent with economically and efficiently operated providers, "No we did not, we were simply trying to follow the provisions of the Appropriations Act and had no reason to know precisely whether those rate reductions would result in a violation."

(Depo, Thomas Collins, 3/14/00, p. 17). Mr. Collins was then asked, "Was there any other reason for the reduction other than the deficit?" He answered, "No".

Sandra Victor, chief of policy development and implementation in the Bureau of Health Services financing, whose section is responsible for promulgation of the rules governing Medicaid, testified as follows with regard to the notices:

"Q: Did they explain why the agency was changing?

A: Yes, it did.

Q: Why was that?

A: To avoid a budget deficit." (Depo. Sandra Victor, 3/13/00, p. 14)

Additionally, Jerry Barnard, Rate Determination Specialist 2, observed as follows with regard to the seven percent (7%) reduction:

"Q: Can you tell us if the 7 percent cut that's been implemented fits into that methodology at all?

A: No. It doesn't.

Q: It does not?

A: It's not in the approved methodology in the state plan."

Further questioning revealed the following:

"Q: It's just an across the board cut?

A: Right.

Q: Independent of the methodology completely, is that right?

A: That's the way I look at it." (Depo., Jerry Barnard, 3/14/00, p. 22, 23)

John Marchand, section chief for institutional reimbursements/director of institutional reimbursements, added the following:

"Q: So, how do you base—what do you base your assurance on now that the rate for ICF/MRs is consistent with economically and efficiently operated providers?

A: I didn't make an assurance.

Q: Well, other testimony has indicated that your office is required to keep all the documentation necessary to give that assurance. What documentation do you have, or do you have any basis to indicate that a 7 percent reduction is consistent with economically and efficiently operated providers?

A: I do not." (Depo., John Marchand, 3/15/00, p. 64)

Mr. Marchand later admitted to having no data whatsoever to support an assurance that the rates for long-term care hospitals would be consistent with an efficiently and economically operated provider and that the services would be as equally available to Medicaid beneficiaries as to the general population. (Depo., p. 67–68).

Clearly, from the testimony, it can be concluded that no studies were contemplated, much less completed, to determine if the reductions would violate section 1396a(a)(30)(A). There was no evidence of a determination of the impact the seven percent (7%) reduction would have on providers. The individuals deposed virtually unanimously noted that the reductions were enacted for budgetary reasons. The published notice cited budgetary concerns as the reason for the change. Numerous courts, including the Seventh Circuit, Eighth Circuit, and Middle District of Alabama have concluded that parties have a federal right under section 30(A) which is enforceable through section 1983. As the United States Supreme Court stated in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), it is the state's burden to show "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." Based upon the evidence presented, this Court can not conclude at this time that Congress intended to preclude a private right of action for violations of section 1396a(a)(30)(A) through the repeal of the Boren Amendment. It is therefore determined that plaintiffs have proven a substantial likelihood of success on this issue, supporting their request for injunctive relief.

Turning to plaintiffs' claim that the defendant violated section 1396a(a)(13)(A), again this Court can not, in good con-

science, conclude that the repeal of the Boren Amendment precludes a private right of action under section 1983. As previously discussed, the "new" section 1396a(a)(13)(A) sets forth very specific requirements which are, by the language of the statute, mandatory when determining rates of payment. This section of the Medicaid Act appears to have retained procedural rights, even if the substantive rights were eliminated by the repeal of the Boren Amendment.

Section 13 requires the proposed and final rates, along with the methodologies underlying such and the justification for such to be published. The notices in question did not provide the required information. Sandra Victor answered as follows in her deposition:

"D: Did the notices that you prepared include the proposed new rates for ICF/MRs, the proposed new rates for hospitals, the proposed new rates for nursing facilities?

A: That information was not in my notice. I believe it was submitted to the hospitals and efficient providers under separate cover.

Q: Was it sent to the patients, beneficiaries?

A: Recipients?

Q: Yes.

A: No, I don't think it was." (Depo., Sandra Victor, 3/13/00, p. 19)

Section 1396a(a)(13)(A) mandates that "providers, beneficiaries and their representatives, and other concerned state residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications." As the notices in question did not provide the required information, and it is unclear from the deposition testimony presented whether that information was available at all, it is virtually impossible to conclude at this time that a reasonable opportunity for review or comment on the new rates was given to the interested parties. Further depositions reveal that the situation of hospitals which serve a disproportionate number low income patients with special needs were not considered, although the statute required them to be.

Thomas Collins testified as follows:

"Q: Is it your understanding that the state health plan and the revised (a)(13)(A) requirements require the department to consider the needs of hospitals that receive DSH payments?

A: I don't recall specifically. I think that's correct.

Q: Was a conscious decision made not to pay attention despite the mandatory requirement?

A: I'm not sure we took that into consideration at all. We were simply looking at the overall picture and trying to comply with the Appropriations Act.

Q: So, you would admit that you disregarded the requirement in the Social Security Act?

A: Yes, I would have to say that we did because I don't recall considering that." (Depo., Thomas Collins, 3/14/00, p. 49–50)

Additionally, this Court considered the fact that perhaps "emergency rules" would not have been necessary had the issue of the predicted budget shortfall been addressed earlier. It was revealed through various depositions that the budgetary shortfall was known at least as early as November and likely even earlier. Charles Castille, undersecretary of the Louisiana Department of Health and Hospitals, notes in his deposition that as early as July and August 1999 correspondence was passed ordering spending freezes in the department, suggesting a budgetary problem. He further commented, "We knew before the Governor had issued the executive order that we had a projected shortfall of approximately $153 million at that time in the part of the Medicaid budget that deals specifically with payment to private providers." (Depo., Charles Castille, 3/22/00, p. 38). He further states that the department had "hard and substantial knowledge" of the shortfall in early November 1999. Previous reviews, he fur-

ther noted, had revealed the problem before that time, although further research was suggested. (Depo., p. 15) Had the projected shortfall been addressed at an earlier time, perhaps beneficiaries and providers would have had a satisfactory opportunity for meaningful review and comment of the proposed changes.

Plaintiffs have also proven a substantial likelihood of success on the merits with regard to the issue of public process as required by the statute. As such, it is logical to conclude that, should plaintiffs prove successful their claims of section 30 and 13 violations, then the state plan is not being administered in a way which is in the best interest of recipients, which would be a violation of sections 19 and 33. Tied in with the foregoing are the alleged violations of state law as well as plaintiffs Constitutional rights. Should plaintiffs be successful in their above mentioned claims, it is likely that some Constitutional and state law violations were also committed, as the issues are so intertwined. As plaintiffs have proven a substantial likelihood of success on the merits of their section 1396a claims, it follows that the same is true for various alleged Constitutional and state law violations which are closely related.

Further, this Court concludes that there is a real and substantial threat of irreparable injury without the issuance of the requested injunction. Plaintiffs contend that, should their rates of payment be reduces as proposed, it is possible, and even likely, that many providers will be unable to continue providing necessary services. This may result not only in the discharge of patients named in this lawsuit, as well as other disabled patients, but in the possible bankruptcy of some facilities. Plaintiffs views were supported by various affidavits which were submitted with their memorandum(s) in support of the Application for Temporary Restraining Order. Should these providers not receive the funds necessary to provide their services, they may be forced to turn away new and release current patients, which would be detrimental to society as a whole.

Further evidence in support of the threat of irreparable harm was provided through the deposition of Jerry Barnard. The testimony revealed the following regarding durable medical equipment which is a targeted reduction in addition to the seven percent (7%):

"Q: So if DME is eliminated, how will an efficiently and economically provider such as Evergreen provide DME for its patients?

A: I don't know.

Q: Would there be a risk that they would be providing their services then at below their cost if they provided DME that is no longer covered?

A: Actually, no, I don't think so because I don't think they would keep the client.

Q: What do you mean by "they wouldn't keep the client"?

A: I think they would discharge the client or not admit him.

Q: Would that create an access problem for those kinds of patients?

A: I think so.

Q: have you expressed these concerns in any way within the department?

A: Yes." (Depo., Jerry Barnard, 3/14/00, p. 13–14)

Further deposition testimony from Jerry Barnard disclosed the following:

"Q: Would a reduced rate be more consistent with the cost of an EEOP such as Evergreen or less consistent with the real cost of an EEOP?

A: I think it would be less because I don't think we've given them 7 percent inflation since we set the—from the '95 cost reports." (Depo., p. 28)

Should the injunctive relief not be provided and the cuts effected, the potential damage to providers and patients would be irreversible even if plaintiffs are ultimately successful in their claims. The damage to those patients refused services, discharged, or unable to receive the neces-

sary care would be potentially devastating and certainly presents a substantial threat of irreparable injury.

Related to this finding is the realization that the "threatened injury to movant outweighs any damage to the opponent". Should the defendant be unable to effect certain reductions in the Medicaid budget at this time, little or no permanent damage will be done. Should the defendant ultimately prove successful, the Department of Health and Hospitals can implement the cuts at that time. Additionally, as noted by this Court during its May 4, 2000 hearing, the state budget provides for numerous unnecessary expenses, money which could potentially solve the Medicaid deficit. Also, there have been various proposals suggested, such as intergovernmental transfers for correcting the Medicaid deficit. The Court notes such in an effort to demonstrate that the Department of Health and Hospitals can not only recoup any rightful funds they may be entitled to at a later date, but can actively consider solutions and perhaps discover an ultimate resolution of the deficit problem while this case is pending. Plaintiffs would have no redress for the problems they potentially face should the injunction not issue. Defendants threat of injury is far outweighed by the threat of injury to patients and providers.

Finally, we, as a society, have an obligation to our low income elderly and handicapped members. As this Court noted in its March 3, 2000 ruling, "This Court certainly feels that the public has a serious interest in providing medical care and services to low income persons who are over the age of sixty-five (65), who are blind, disabled, and/or mentally unable to care for themselves". The public interest is served by caring for those who, through no fault of their own, are unable to care for themselves. It is the duty of a responsible society and its official bodies to ensure that those individuals are provided with adequate care. Should these officials fail in this duty by, for example, not following the laws governing various programs, it is the responsibility of the Courts called upon to protect the individual's rights. To do so certainly serves the public interest.

## CONCLUSION

For the reasons set forth above, plaintiffs' request for a preliminary injunction is granted.