# United States Court of Appeals
## For the First Circuit

No. 02-1059

BONNIE BRYSON and CLAIRE SHEPARDSON, on behalf of themselves
and all others similarly situated,
Plaintiffs, Appellees,

v.

DONALD SHUMWAY, in his capacity as Commissioner of NEW HAMPSHIRE
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
SUSAN FOX, in her capacity as Director of NEW HAMPSHIRE DIVISION
OF DEVELOPMENTAL SERVICES,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge, and
Lynch, Circuit Judge.

Sheila Zakre, with whom Amy Messer and Disabilities Rights
Center, Inc. were on brief, for appellees.

Daniel J. Mullen, Associate Attorney General, with whom Philip
T. McLaughlin, Attorney General, and Suzanne M. Gorman, Senior
Assistant Attorney General, were on brief, for appellants.

October 15, 2002

LYNCH, **Circuit Judge**.  Plaintiffs suffer from acquired brain disorders and have the option to receive medical care for that condition under the Medicaid program.  They would prefer to receive those services in a home care setting through a model program New Hampshire has established under a Medicaid waiver approved by the Secretary of Health and Human Services.  42 U.S.C. § 1396n(c) (2000).  The difficulty is that there are more people who want to be in the model program than there is room in the program.

The patients sued, on behalf of a class, relying on Medicaid statutory language, id. § 1396n(c)(10), and arguing that if New Hampshire set up a model program at all, Congress required that the waiver program have at least as many slots as the number of applicants, up to a limit of 200.  They also argued that New Hampshire did not fill even the available slots within a reasonable time.  Finally, they argued that the notices given to those on the waiting list were inadequate.

The district court agreed that New Hampshire was mandated by the Medicaid statute to create more slots in its model program and also that notice was inadequate.  It did not address the second issue.  We reverse the district court's ruling on the first issue and remand the other two issues, vacating the notice ruling and the injunction.

Bonnie Bryson and Claire Shepardson have acquired brain disorders (ABDs), which manifest before age sixty, are neither congenital nor caused by birth trauma, and present "a severe and life-long disabling condition which significantly impairs a person's ability to function in society." N.H. Code Admin. R. Ann. the plaintiff class they represent are being treated in a variety of settings, from nursing homes to psychiatric hospitals to private homes.[1]

Medicaid is an optional plan under which the federal government, through the states, partially funds medical assistance to needy individuals. See § 1396; Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990). Not everyone is eligible for Medicaid-funded treatment; to be eligible, an individual must have limited resources and must fit into an eligibility category. For disabled adults, the most common route to eligibility is receiving Supplemental Security Income (SSI) on the basis of disability. See § 1396a(a)(10)(i)(II). Some states, including New Hampshire, also elect to cover some medically needy individuals who are not poor

---

[1] While the waiver program under § 1396n(c) is designed for individuals who "require the level of care provided in a hospital or nursing facility or intermediate care facility for the mentally retarded," § 1396n(c)(1), some individuals who would be eligible for the waiver program, including members of the plaintiff class, are currently in private homes, covered either by private insurance or personal funds. J. Perkins & R.T. Boyle, Addressing Long Waits for Home and Community-Based Care Through Medicaid and the ADA, 45 St. Louis U. L.J. 117, 117 (2001) (describing individual cases).

enough to be covered by SSI. J. Perkins, Medicaid: Past Successes and Future Challenges, 12 Health Matrix 7, 12 n.21 (2002); see § 1396a(a)(10)(C).

In 1993, New Hampshire[2] requested federal approval to provide home and community-based services for individuals with ABDs under the Medicaid waiver provisions. Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c), permits states to include in their Medicaid plans non-medical services, such as case management, habilitation services, and respite care. Id. § 1396n(c)(4)(B). States must apply for a waiver and be approved in order to include such services in their Medicaid plans. Id. § 1396n(c)(1). Programs approved under this subsection are waived from many Medicaid strictures, id. § 1396n(c)(3), such as the requirements that programs be in place statewide, see id. § 1396a(a)(1), and that medical assistance be made available to all individuals equally, see id. § 1396a(a)(10)(B). Waivers are initially approved for three years and may be re-approved for five-year periods. Id. § 1396n(c)(1). The waiver program is designed to allow states to experiment with methods of care, or to provide care on a targeted basis, without adhering to the strict mandates of the Medicaid system.

---

[2] The defendants in this case are Donald Shumway, Commissioner of the New Hampshire Department of Health and Human Services, which applied for the Medicaid waiver, and Susan Fox, Director of Developmental Services, which administers the waiver program. We will refer to the two defendants collectively as "New Hampshire."

There are three primary types of home and community-based waivers. The first type, at issue here, concerns the treatment of individuals who would otherwise be treated in an institutional setting such as a hospital or nursing home. See id. § 1396n(c); 42 C.F.R. §§ 440.180, 441.300-.302 (2002). The second type is for individuals over sixty-five who would otherwise be in a nursing home. See § 1396n(d). The third type targets children under age five who have AIDS or are born dependent on drugs. See id. § 1396n(e). There are currently about 240 home and community-based waiver programs nationwide. J. Perkins & R.T. Boyle, Addressing Long Waits for Home and Community-Based Care Through Medicaid and the ADA, 45 St. Louis U. L.J. 117, 126 (2001).

To participate in the waiver program, states must apply to the federal Centers for Medicaid and Medicare Services (CMS). 42 C.F.R. § 430.25(e). The Administrator of CMS has the authority to approve or deny requests, but must consult with the Secretary of Health and Human Services (HHS) before denying a request. Id. § 430.25(f)(2)(ii).

In theory, the waiver plans are expenditure-neutral; the average estimated per capita expenditure under the waiver plans must not be more than the average estimated expenditure absent the waiver program. § 1396n(c)(2)(D). In practice, the waiver programs may be costly to the states, because even though the individuals served by the waiver plan are no longer being served by nursing homes or

other care facilities, other patients may take those nursing home spots. Many patients not currently being served under Medicaid may also apply for the waiver program. See Perkins & Boyle, supra, at 119. The states thus have a financial incentive to keep their waiver programs small, or at least, to begin with small programs and grow them incrementally.

New Hampshire applied for a model waiver, which differs from regular waivers primarily in that model waivers, by HHS regulation, may not serve more than 200 individuals at any one time. 42 C.F.R. § 441.305(b)(1). New Hampshire's model waiver request, however, proposed to serve a far smaller number of individuals than the 200 person maximum. The original waiver request proposed that 15 individuals be served in the first year (1993 - 1994), 26 in the second year, and 37 in the third year. In 1996, New Hampshire requested and HHS approved an amendment to the waiver to accommodate 74 individuals in the third year of the program instead of 37. The State also requested a renewal of the waiver for five more years, from 1996 through 2001; HHS approved this request in 1997. New Hampshire initially requested funding for only 74 slots for each of the five years of the waiver renewal, but in 1998 it requested, and HHS approved, an amendment to the renewal, such that the program would serve 77 individuals in the fifth year, 81 in the sixth year, 85 in the seventh year, and 89 in the eighth year. In August 2001, New Hampshire requested an extension for the waiver, which HHS

granted through January 2002.  New Hampshire has since applied for and was granted a five-year renewal of the waiver program, with an increasing number of slots from 117 up to 130 over the five-year period.

There have always been more applicants for home and community-based ABD services in New Hampshire than there have been available slots.  The waiting list has ranged from 25 people in the first year to a height of 87 in the 1997-1998 year.

It is undisputed that up until recently, some of the approved waiver slots have not been filled.  The parties differ as to how many slots have historically gone unused, for how long and for what reasons; furthermore, there is no agreement as to whether there continues to be any unused waiver slots.

Bryson, Shepardson, and the plaintiff class have applied for community-based services under the New Hampshire Home and Community Based Waiver for Persons with Acquired Brain Disorders. They have not received these services; New Hampshire instead has placed them on a waiting list, where they remain.

II.

On December 2, 1999, Bryson and Shepardson sued the two New Hampshire state officials, on behalf of themselves and all others similarly situated, seeking injunctive and declaratory relief pursuant to 42 U.S.C. § 1983.  The suit challenged the defendants'

failure to provide home and community-based services under the model waiver program to the plaintiff class afflicted with ABD.

The complaint pled seven distinct counts; only two counts are relevant to this appeal.[3] The first, Count II of the complaint, alleged that under federal law, Medicaid services must be furnished with "reasonable promptness" under § 1396a(a)(8) and that the New Hampshire defendants were in violation of this provision. The second, Count VII of the complaint, alleged that federal law requires that the plaintiffs receive notice and the opportunity for a hearing when they have been placed on a waiting list, id. § 1396a(a)(3), and that New Hampshire has not provided such notice.

On October 23, 2001, the District Court for the District of New Hampshire granted the plaintiffs' motion for summary judgment as to Count VII, the notice allegation. Bryson v. Shumway, 117 F. Supp. 2d 78, 81 (D.N.H. 2001). The court found that § 1396a(a)(3), which requires an opportunity for a fair hearing when a "claim for medical assistance . . . is denied," is triggered when applicants are placed on the waiting list for waiver services. Id. at 98.

---

[3] The plaintiffs' other five counts are as follows: Count I alleged that the waiver program was insufficiently funded, relying on §§ 1396a(a)(17), (19), and regulatory provisions; Count III alleged a violation of the integration mandates of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (2000); Count IV alleged disability-based discrimination in violation of Title II of the ADA and section 504; Count V alleged that the standards by which the ABD waiver program was operated constituted a due process violation; and Count VI restated the notice complaint of Count VII as a due process violation.

On December 10, 2001, the district court granted judgment in favor of the plaintiffs on Count II, ruling that the "[d]efendants have violated the reasonable promptness requirement of the Medicaid Act" and requiring that they "request enough waiver slots to serve the plaintiff class and to provide Medicaid funded waiver services to Plaintiff class in a period not to exceed 12 months, absent extraordinary circumstances." Bryson v. Shumway, No. 99-558-M, at 5 (D.N.H. Dec. 10, 2001). This appeal followed.

### III.

We review grants of summary judgment "de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). We review a district court's interpretation of a statute de novo. Riva v. Massachusetts, 61 F.3d 1003, 1007 (1st Cir. 1995).

Other rules govern the issue of statutory interpretation. If the meaning of a statute is clear, we enforce that meaning. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Here, the statute in question has been interpreted by a federal administrative agency in a rule promulgated through notice and comment. That interpretation is governed by the second-level Chevron standard: if Congress has not spoken to the question at issue, we may not substitute our own reading of the

-9-

statute unless the agency's interpretation is unreasonable. Id. at 843-44.

A.  Reasonable Promptness

The statute, 42 U.S.C. § 1396a(a)(8), requires that "medical assistance . . . shall be furnished with reasonable promptness to all eligible individuals."  The plaintiffs contend that New Hampshire's operation of the ABD waiver program violates § 1396a(a)(8) by failing to furnish the waiver services with "reasonable promptness."  They seek to enforce this provision through 42 U.S.C. § 1983.  The plaintiffs make alternative arguments for why they believe that New Hampshire has failed to meet its duties under § 1396a(a)(8).

1.  Requirement of 200 Waiver Slots

Plaintiffs first argue that New Hampshire is required by statute to request a waiver to accommodate at least 200 individuals. They rely on statutory language governing waiver programs, which states:

> (c) Waiver respecting medical assistance requirement in State plan: scope, etc.; "habilitation services" defined; imposition of certain regulatory limits prohibited; computation of expenditures for certain disabled patients; coordinated services; substitution of participants
>
> . . .
>
> (10) The Secretary shall not limit to fewer than 200 the number of individuals in the State who may receive home and community-based services under a waiver under this subsection.

-10-

§ 1396n(c)(10).  Plaintiffs interpret this statute to require that states requesting waivers design plans that accommodate at least 200 individuals, arguing that is the plain meaning of the statute itself and the thrust of the surrounding legislative history.  The core statutory argument is that because the waiver programs must receive the Secretary's approval, this 200-person minimum should be read as a limit on both the state applying for the waiver as well as on the Secretary.  Plaintiffs argue that the states are restricted from offering less than 200 slots and the Secretary is restricted from approving less than 200 slots.

a.  <u>Plain Reading of the Statute</u>

        We turn first to the language of the statute itself. If a statute is unambiguous, we use neither legislative history,[4] <u>Dep't</u>

_____

    [4] At times, though, we use legislative history as a check to confirm the correctness of our interpretation in very complex areas of regulation.  <u>Cablevision of Boston, Inc.</u> v. <u>Pub. Improvement Comm'n</u>, 184 F.3d 88, 101 (1st Cir. 1999) ("[A] court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute . . . .").  Even were we to rely on the legislative history of § 1396n(c)(10), as plaintiffs request, it would not require the conclusion that § 1396n(c)(10) was meant to mandate that waiver plans serve at least 200 individuals.
    Paragraph 1396n(c)(10), as originally written, stated that "[n]o waiver under this subsection shall limit by an amount less than 200 the number of individuals who may receive home and community-based services." Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4118(b), 101 Stat. 1330-1, 1330-155.  The paragraph was amended to the current language the next year.  <u>See</u> Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 411(k)(10)(A), 102 Stat. 683, 794.  The plaintiffs have submitted no legislative history with regard to this change, and there appears to be little discussion in the relevant committee reports.  <u>See</u> H.R. Rep. No. 100-105(I) (1987), <u>reprinted in</u> 1988

-11-

of Hous. & Urban Dev. v. Rucker, 122 S. Ct. 1230, 1234 (2002), nor administrative agency interpretation, Chevron, 467 U.S. at 842-43.

Neither the language nor the structure of § 1396n(c)(10) supports plaintiffs' reading; the statute does not require applications for state waiver programs to serve at least 200 individuals.  The language of the paragraph, by its very terms, governs only the Secretary's ability to deny approval of waiver plans.  See § 1396n(c)(10) ("The Secretary shall not limit . . . .").  The statute does not purport to govern the behavior of the states or the contents of the waiver plans themselves. Moreover, the paragraph does not, by its terms, prevent the Secretary from approving plans unless there are a certain number of slots.  It only governs the Secretary's actions when she or he is acting to limit the content of waiver plans as to the number of individuals to be served.

Comparing the language of § 1396n(c)(10) to the remainder of § 1396n(c), which governs waiver services, makes this reading

---

U.S.C.C.A.N. 803; H.R. Rep. No. 100-105(II) (1987), reprinted in 1988 U.S.C.C.A.N. 857; H.R. Conf. Rep. No. 100-661, at 269 (1988), reprinted in 1988 U.S.C.C.A.N. 923, 1047.
    The only legislative history the plaintiffs cite, that of the 1987 statute, see H.R. Conf. Rep. No. 100-495, at 760 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1245, 2313-1506, is inapposite. All we are left with is the simple fact that Congress altered the language of paragraph 10 by striking language that supported the plaintiffs' contentions.  Even were we to construe the legislative history, then, we would find that if it has any effect at all, it is to bolster the interpretation that the statute in its current form governs only the actions of the Secretary.

even more compelling. Some provisions of subsection (c) directly govern the content of the waiver plans; these clearly state their purpose in limiting the content of the plans directly. See id. § 1396n(c)(2) ("A waiver may not be granted under this subsection unless . . . ."). By contrast, § 1396n(c)(10) does not contain such language limiting the content of the plans themselves.

Other provisions of subsection (c), like (c)(10), operate to prevent the Secretary from unduly restraining the state plans.[5] For instance, the Secretary may not restrict "the number of hours or days of respite care" provided under a waiver plan, id. § 1396n(c)(4), nor may he require that the waiver plan spend no more money than the approved estimates as a condition of waiver approval, id. § 1396n(c)(6). These provisions merely prevent the Secretary from imposing conditions onto the waiver plans. Similarly, § 1396n(c)(10) restricts the Secretary's ability to limit the size and funding of waiver plans. Read together, these provisions, like paragraph 10, ensure that the states will be able to receive funding for waiver plans up to a certain size and free from restrictions on how much care is provided to each individual. They do not dictate to the states the content of their waiver applications.

_____

[5] This is also consistent with the language of § 1396n(c), the title of which includes such subjects as "imposition of certain regulatory limits prohibited," obviously a reference to paragraph 10.

Finally, it is evident that § 1396n(c) contemplates state waiver plans with definite limits on the number of individuals served. Paragraph 9 permits state plans to replace individuals who die or become ineligible with other individuals "[i]n the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or community-based services." Id. § 1396n(c)(9). State plans, then, certainly have the right to include a limit on the number of waiver slots they request.[6]

This statute, § 1396n(c)(10), is most plausibly read as limiting only the ability of the Secretary to impose such restrictions, and not the ability of the states to propose or the Secretary to approve waiver plans serving fewer than 200 individuals.

b. Administrative Deference

Even if there were doubt as to the plain meaning of § 1396n(c)(10) on its face, the administrative interpretation of HHS does not support the plaintiffs' position. If Congress has not spoken on the precise question at issue, we respect the statutory

_____

[6] Our reading is also most consistent with another paragraph of subsection (c), which plainly permits states to set limits on the number of individuals served. Section 1396n(c)(4)(A) permits waiver plans to limit the individuals served to those for whom the state has determined that the amount of medical assistance under the waiver will not exceed the amount that would be provided if the waiver did not apply. This paragraph does not reference § 1396n(c)(10), nor does it restrict a state's ability to limit the number of individuals served by waiver plans.

interpretation of the federal administrative agency given that interpretative task, unless the interpretation is unreasonable. Chevron, 467 U.S. at 842-44.

Congress has authorized HHS to interpret the statutes in question and implement regulations in this area. 42 U.S.C. § 1302. HHS has interpreted § 1396n(c)(10) through a regulation governing model waivers, which decrees that the number of individuals served under a model waiver program "may not exceed 200 recipients." 42 C.F.R. § 441.305(b). It is possible to read the regulation, which permits no more than 200 recipients under a model waiver program, and § 1396n(c)(10), which plaintiffs urge permits no fewer than 200 under any waiver program, to result in a scheme in which all model programs must serve exactly 200 individuals. Nonetheless, that is not the most likely reading. The regulation's use of the term "exceed" indicates that HHS contemplates model waiver programs that serve fewer than 200 individuals.

This conclusion is bolstered by the comments accompanying the announcement of the final rule. HHS concluded that while § 1396n(c)(10) "could, arguably, be read to limit the actual number of individuals who may receive model waiver services to no less than 200, . . . we believe that this reading is unsupportable." Medicaid Program; Home and Community-Based Services and Respiratory Care for Ventilator-Dependant Individuals, 59 Fed. Reg. 37,702, 37,711 (July 25, 1994).

-15-

HHS's interpretation of this statute is certainly not unreasonable. HHS reads § 1396n(c)(10) as allowing states to choose the size of their waiver programs, rather than requiring that the waiver programs be at least a certain size. This interpretation is consistent with the agency's longstanding interpretation of the waiver program. See Medicaid Program; Home and Community-Based Services, 50 Fed. Reg. 10,013, 10,021 (Mar. 13, 1985) (stating that HHS "believes that Congress intended to give the States maximum flexibility in operating their waiver programs").

The policy reasons are obvious: states, and particularly small states, may be discouraged from applying for model waiver programs at all if the choices are a program serving 200 individuals at the partial expense of the state, or not creating a model program at all and providing only the standard Medicaid services. Rather, Congress wished to encourage the states to pursue waiver programs, so that the states would create the types of model programs contemplated. Sympathetic as these plaintiffs are, the long-term logic of their argument may lead to the constriction, not the expansion, of these types of alternative programs. In sum, even were we to find this statute ambiguous, the interpretation offered by HHS is reasonable, given the structure and language of the statute.

The Secretary has also interpreted this statute in a different context. He has approved waiver plans that anticipate

serving fewer than 200 individuals, such as the plan at issue here. Because the approval process did not utilize formal procedures, it may not be entitled to Chevron deference, see Christensen v. Harris County, 529 U.S. 576, 587 (2000), but there remains the deference owed agencies due to their "specialized experience." Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944); see United States v. Mead Corp., 533 U.S. 218, 234-39 (2001) (applying Skidmore deference). The Secretary has interpreted the statute to permit waiver plans with fewer than 200 slots, and we defer to his expertise in the construction and purpose of the statute.

2. Unfilled Waiver Slots

The district court rested its finding for the plaintiffs on the ground we have rejected: that the state waiver plan must serve at least 200 individuals. Bryson, No. 99-558-M, at 4. Plaintiffs have, however, asserted a separate and distinct argument alleging a violation of the "reasonable promptness" provision of § 1396a(a)(8). They argue that New Hampshire has failed to fill even the number of individual waiver slots it has requested, and so the plaintiff class members have not been furnished medical assistance "with reasonable promptness." We first consider whether there is an actionable claim.

a. § 1983 Cause of Action

There is liability against persons who act under color of law to deprive individuals of "any rights, privileges, or immunities

-17-

secured by the Constitution and laws" of the United States under 42 U.S.C. § 1983.  This provision creates a cause of action for federal statutory as well as constitutional rights, Maine v. Thiboutot, 448 U.S. 1, 4-8 (1980), including, in some circumstances, violations of the Medicaid Act, Wilder, 496 U.S. at 524.

Not all violations of federal law result in a cause of action under § 1983.  "A plaintiff must assert the violation of a federal right, not merely the violation of federal law."  Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original). Moreover, a federal right must be "unambiguously conferred" in order to support a cause of action under § 1983.  Gonzaga Univ. v. Doe, 122 S. Ct. 2268, 2275 (2002).

Blessing set out a three-part test for guidance in determining whether a statutory provision confers an enforceable federal right.  First, Congress must have intended that the provision benefit the plaintiff.  Second, the right must not be "vague and amorphous."  Third, the statute must unambiguously impose a binding obligation on the states.  Blessing, 520 U.S. at 340-41. Ultimately, of course, this is an issue of congressional intent, and the three tests are just a guide.  Gonzaga, 122 S. Ct. at 2279 (Breyer, J., concurring).  The statute satisfies the three tests as to claims about unfilled waiver slots that are part of an approved state Medicaid plan.

First, the statute, on its face, does intend to benefit the plaintiffs. Section 1396a(a)(8) requires that state Medicaid plans provide that medical assistance "shall be furnished with reasonable promptness to all eligible individuals." This paragraph is a part of the litany of procedural and substantive protections which state Medicaid plans must provide, such as the opportunity for a hearing, see § 1396a(a)(3), and safeguards against the disclosure of private information, see id. § 1396a(a)(7). By its terms, it benefits "eligible individuals." Id. § 1396a(a)(8). Those patients who are on the waiting list and for whom slots are available[7] are, we think, "eligible" under the statute such that they are entitled to reasonable promptness. See Boulet v. Celluci, 107 F. Supp. 2d 61, 77 (D. Mass. 2000) ("The cap on waiver services is simply a constraint on eligibility."). The first prong of Blessing has been met.

Second, the right conferred is not vague or amorphous. "A statute is not impermissibly vague simply because it requires judicial inquiry into 'reasonableness.'" Albiston v. Maine Comm'r of Human Servs., 7 F.3d 258, 267 (1st Cir. 1993) (construing the "reasonable promptness" provision of 42 U.S.C. § 602(a)(10)).

---

[7] The parties advise us that it is not an easy matter to determine the patients on the waiting list for whom slots are available. It is not a matter, necessarily, of who is next on the list. The slots opening up may be in one geographic location; a particular patient may be in another. These are issues that can be considered on remand.

-19-

Common law courts have reviewed actions for reasonableness since time immemorial. See, e.g., 1 W. Blackstone, Commentaries *77 (analyzing the reasonableness of customs).

Finally, § 1396a(a)(8) does unambiguously bind the states. The subsection mandates that state plans "must" provide that medical assistance "shall" be provided with reasonable promptness. These are not mere guidelines, but rather requirements which states must meet under the Medicaid system.

One other circuit court has found that the reasonable promptness provision of § 1396a(a)(8) provides a cause of action under § 1983. See Doe v. Chiles, 136 F.3d 709, 719 (11th Cir. 1998); cf. Cospito v. Heckler, 742 F.2d 72, 81 n.14 (3rd Cir. 1984) (interpreting § 1396a(a)(8) in a procedural due process context and finding that "eligible patients have a legitimate claim of entitlement to be able to avail themselves of Medicaid benefits"). While this Court has never before addressed this precise question, we did uphold a § 1983 cause of action under the "reasonable promptness" provision of the Social Security Act. Albiston, 7 F.3d at 264 (finding that 42 U.S.C. § 602(a)(10) provides "reasonably clear, judicially enforceable obligations directly on the participating States").

The strictures of § 1396a(a)(8) should apply with no less force to opt-in plans such as the waiver program. Once the waiver plan is created and approved, it becomes part of the state plan and

therefore subject to federal law; the waiver plans must meet all requirements not expressly waived.  See Doe, 136 F.3d at 714-15 (upholding a § 1983 cause of action under § 1396a(a)(8) as applied to an optional program).

In sum, we find that there is a § 1983 cause of action arising from the "reasonable promptness" provision of 42 U.S.C. § 1396a(a)(8) under the state model waiver plan as approved.

b.  Factual Development

It is not clear to us, though, whether there is a live controversy on this issue or, if so, what the dimensions of it are. No facts have been developed on this point.  New Hampshire claims that there are no longer any unfilled waiver slots, while the plaintiffs believe that the issue may continue to be a live one. Even if there are currently unfilled waiver slots, we know nothing about the history of each waiver slot and the process and procedure of replacing individuals who held those slots.

When an individual ceases to use the waiver plan services, there is necessarily a time gap while an individual on the waiting list is chosen to take the unfilled slot and while services are made available.  Because of that lag in time, the fact that some slots are unfilled may be consistent with New Hampshire diligently filling the empty slots with reasonable promptness.  It may also indicate that New Hampshire is not being reasonably prompt in its provision of medical assistance.

The parties have stipulated that absent extraordinary circumstances, ABD waiver services can be implemented within one year from the time that an individual is found to be eligible. More information is necessary in order to ascertain whether or not the guarantee of reasonable promptness has been satisfied. We remand this aspect of plaintiff's claim to the district court.

B. Notice

42 U.S.C. § 1396a(a)(3) requires that state Medicaid plans "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." See also 42 C.F.R. § 431.220(a)(1) (mirroring the language of § 1396a(a)(3)). State plans must also notify applicants of the right to obtain a hearing and the method of obtaining one when the applicant first applies to Medicaid or when any action is taken which affects the applicant's claim. 42 C.F.R. § 431.206(b)-(c). The specific contents of the notice are governed by § 431.210. Overall, HHS has made clear that "[t]he hearing system must meet the due process standards set forth by Goldberg v. Kelly, 397 U.S. 254 (1970)." § 431.205(d). The defendants do not contest that § 1983 may be used to enforce these notice provisions, so we assume that it may.

Plaintiffs allege that New Hampshire has violated their right to notice by failing to notify applicants of their right to

a hearing when they were notified of their eligibility and placed on a waiting list. The district court agreed, granting summary judgment to the plaintiffs on this count and holding that "a finding of eligibility coupled with an indefinite deferral of services constitutes a denial of services," thereby triggering the notice requirement under § 1396a(a)(3). Bryson, 177 F. Supp. 2d at 97. While applicants were notified of their placement on the waiting list, the notifications often did not contain information concerning the right to request a hearing or the method of obtaining one.

As the district court noted, its ruling on notice depended to a certain extent on its view of whether New Hampshire had to create slots for all applicants. Id. We have negated that view. There is also a significant question about the precise purpose of a hearing under the approved plan. It is one thing to have a hearing if New Hampshire is obligated to create slots for up to 200 individuals, as the district court ruled. It is another to contemplate a hearing if there are no available slots and there is no requirement to give the first available slot to the next person on the list. It is yet another thing if there is an available slot and the sole issue, applying pre-set criteria for priority status, is who on the waiting list should be placed in that slot.

New Hampshire has said that it has since modified its system of eligibility notice to conform to the statutory and regulatory requirements. There is thus a danger that the issue of

-23-

notice is not a live one.  See Powell v. McCormack, 395 U.S. 486, 495-97 (1969).  A moot issue does not meet the "case" or "controversy" requirement of the Constitution.  U.S. Const. art. III, § 2; Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964). Mootness must be considered even if ignored by the parties themselves.[8]  St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 537 (1978).

Given the context of New Hampshire's recent claim that it has modified its notification procedure and is now in accord with statutory and constitutional requirements, we think it better to vacate the district court's ruling.  We remand this issue to the district court for further factual findings.  If New Hampshire's current notice system is adequate, then this count should be dismissed.  We are optimistic that if further notice issues remain, the parties will work out the matter by agreement.

IV.

For the reasons stated above, we **reverse** the district court's ruling that the waiver plan must include 200 slots, **vacate**

---

[8] If mootness evolves upon appeal, "the judgment below normally is vacated with directions to dismiss the complaint." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 288 n.9 (1982).  Mootness may evolve during the course of a case for a variety of reasons, including the provision of relief by the defendant.  See, e.g., Honig v. Students of the Cal. Sch. for the Blind, 471 U.S. 148 (1985); Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326 (1980); Commissioner v. Shapiro, 424 U.S. 614, 622 n.7 (1976).

-24-

the notice ruling and the injunction, and **remand** the other two issues.