Mario **ESTIVERNE** and Nativida Antoine, individually and on behalf of their infant children, Andrew Estiverne, Dyan Estiverne, and Mario Estiverne, Jr., Plaintiffs,

v.

Debra **ESERNIO–JENSSEN**, individually and as physician, an Long Island Jewish Medical Center, North Shore— Long Island Jewish Health Systems, Inc., Defendants.

No. 06 CV 6617(NG)(RLM).

United States District Court, E.D. New York.

Dec. 14, 2012.

Carolyn A. Kubitschek, David Lansner, Christoper S. Weddle, Jill Marie Zuccardy, Lansner & Kubitschek, New York, NY, for Plaintiffs.

Jonathan B. Bruno, Katherine Dianne Gotelaere, Milli D. Shah, Paul J. Colucci, Kaufman, Borgeest & Ryan, LLP, Robert L. Kraft, State of New York, New York, NY, for Defendants.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiffs Mario Estiverne and Nativida Antoine (the "Adult Plaintiffs"), individually and on behalf of their infant children, Andrew Estiverne, Dyan Estiverne, and Mario Estiverne, Jr. (collectively, the "Infant Plaintiffs"), bring this action, under 42 U.S.C. § 1983, alleging that defendant Debra Esernio–Jenssen, M.D., and her employers, defendants Long Island Jewish Medical Center ("LIJ") and its parent corporation, North Shore—Long Island Jewish Health Systems, Inc. ("Hospital Defendants"), violated Adult Plaintiffs' Fourteenth Amendment rights, as well as Infant Plaintiffs' Fourth and Fourteenth Amendment rights, by improperly detaining and testing Andrew, as well as working with the State to petition for the removal of Infant Plaintiffs from Adult Plaintiffs' custody. Plaintiffs also bring, under New York state common law, claims for medical malpractice and gross negligence.[1] The case was tried by the court without a jury.

---

1. In two prior opinions in this case, the court dismissed several of plaintiffs' claims. On July 31, 2008, the court dismissed as moot claims against the Commissioner of the New York State Office of Children and Family Services. *Estiverne v. Esernio–Jenssen*, 581 F.Supp.2d 335 (E.D.N.Y.2008). On December 23, 2011, the court granted partial summary judgment to Hospital Defendants on several of plaintiffs' claims. *Estiverne v. Esernio–Jenssen*, 833 F.Supp.2d 356 (E.D.N.Y. 2011). In addition, prior to trial, the City of New York entered into a settlement with plaintiff and was therefore dismissed from the case.

## Findings of Fact and Conclusions of Law

A trial on liability and damages was held on various dates between October 22, 2012 and November 19, 2012.[2] Twelve witnesses testified: (1) Dr. Martin Wolpin, plaintiffs' medical expert; (2) Mario Estiverne; (3) Nativida Antoine; (4) Mario Estiverne, Jr.; (5) Dyan Estiverne; (6) Andrew Estiverne; (7) Dr. Dan Barlev, then-LIJ Chief of Pediatric Radiology; (8) Dr. David Godfried, then-LIJ Pediatric Orthopedic Surgeon; (9) Dr. Jenssen, then-LIJ Pediatrician; (10) Dr. Timothy Radomisli, Hospital Defendants' medical expert; (11) Rasheda Goodwine, child protective caseworker for the Administration for Children's Services ("ACS"); and Reginald Bartholemy, plaintiffs' pastor. In addition, the parties submitted the deposition transcripts of several additional witnesses, including some who testified at trial. Based on the preponderance of the credible evidence, as well as the parties' post-trial memoranda, the following are my findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## Findings of Fact

Prior to trial, the parties stipulated that LIJ is a privately owned and operated hospital and that Schneider Children's Hospital ("Schneider") is also a private hospital which was owned and operated by LIJ.

### The Testing and Diagnosis of Andrew

On Saturday, November 27, 2004, Adult Plaintiffs took Andrew, then nine months old, to the emergency room at Schneider, reporting to the emergency room doctor that Andrew had been favoring his right wrist, which was slightly swollen. Ms. Antoine reported that Andrew had on and off fevers over the prior week, up to 101 degrees, and that he had had two infections in the previous month, both of which had resolved. She also informed the doctor that Andrew was learning to stand and would fall at times. An x-ray showed that Andrew had buckle fractures of the right distal radius and ulna, with periosteal elevation. Andrew's arm was therefore put in a splint.

Two doctors who examined Andrew in the emergency room—an orthopedic and a pediatric resident—concluded that tests should be run in order to rule out osteomyelitis.[3] Blood tests and blood cultures[4] were taken in order to further investigate this potential diagnosis. An MRI was also recommended; an MRI potentially could reflect whether osteomyelitis was present. Andrew was admitted to Schneider for further testing and to await the outcome of the laboratory tests. At the time of Andrew's admission, the doctors who had examined Andrew believed that there was a low suspicion of abuse, although the pediatric resident did contact another doctor at Schneider to discuss the potential of abuse. That doctor, Dr. Clifford Nerwin, was a pediatric attending physician who is consulted on potential abuse cases when Dr. Jenssen, who is the head of the Schneider Child Protection Consultation Team, is off duty. Dr. Nerwin directed that a skeletal

---

2. There was a substantial disruption in the trial schedule as the result of Hurricane Sandy.

3. Osteomyelitis is an infection of the bone and can be a reason for a bone break. Osteomyelitis presents as a swollen, painful limb and is sometimes accompanied by an elevated temperature and white blood cell count.

4. A blood culture is a blood test designed to detect bacterial infections. The same sample of blood is evaluated every day for five days and if, at that time, the blood has shown no evidence of bacterial infection, the blood culture is deemed negative.

survey and ophthalmologic exam be scheduled.

On the morning of November 28, 2004, Dr. Dan Barlev, Schneider's Chief of Pediatric Radiology, reviewed Andrew's x-rays. Dr. Barlev determined that the two fractures were 7–10 days old and were of an unusual nature in a child under the age of one. Generally speaking, traumatic buckle fractures occurred only in older, larger children who could walk and whose body mass was significant enough to cause sufficient force, should the child trip and fall, to break the child's bone. In addition, Dr. Barlev noted that there was not an appropriate clinical history of Andrew's injuries. Because Andrew was non-verbal, he could indicate neither the cause of the injury nor any additional injuries that he may have had, and Andrew's parents could not identify how the injury occurred. Dr. Barlev therefore agreed that the previously recommended skeletal survey and ophthalmologic exam should be performed to determine whether any other fractures or unidentified injuries were present. Ordering such tests was standard in cases of unexplained fractures in children of this age because, if there were additional fractures or injuries of which the parents were unaware, they would require treatment. In addition, the results of such testing could reflect whether abuse or neglect was occurring. Dr. Barlev also observed that there was no indication of osteomyelitis. He did note, however, that osteomyelitis could not be ruled out and that, if a clinical concern for such a diagnosis was identified by Andrew's treating doctors, follow up testing would be required.

On the morning of November 29, 2004, Andrew's case was referred to Dr. David Godfried, an attending orthopedic surgeon with a specialty in pediatric orthopedics.

After reviewing Andrew's chart and the results of the blood test, Dr. Godfried agreed that there was no evidence of osteomyelitis. Despite a slight initial elevation of Andrew's white blood cell count (an indicator of infection), a closer look at the levels of specific white blood cells most frequently associated with a bacterial infection—namely, mature and immature neutrophils—reflected normal to below normal levels, a result that did not indicate osteomyelitis. In addition, although Andrew's sedimentation rate was elevated (another possible indication of infection), Dr. Godfried believed this to be the result of a recent ear infection for which Andrew had been treated. Because Dr. Godfried, who had many times treated children for osteomyelitis, believed that there was no likelihood that Andrew had such an infection, he indicated that an MRI was unnecessary.[5] Also, an MRI would require anesthesia and a team of hospital staff who specialized in infant MRIs, which was not justified in light of the lack of evidence of osteomyelitis. Like Dr. Barlev and Dr. Nerwin, however, Dr. Godfried was of the opinion that Andrew needed additional testing to determine whether there were other undetected fractures. Dr. Godfried also found a moderate to low suspicion of abuse.

Later in the day on November 29, 2004, defendant Jenssen examined Andrew for the first time. As noted above, in addition to being a Schneider pediatrician, Dr. Jenssen was the coordinator of Schneider's Child Protective Consultation Team. In this capacity, in situations in which any doctor at Schneider had suspicions of abuse, Dr. Jenssen would assemble the patient's treating doctors and coordinate the appropriate plan for evaluating the child. This included contacting and/or

---

**5.** It is unclear whether an MRI had been scheduled when Andrew was initially admitted to Schneider's. However, if an MRI had in fact been scheduled, it was canceled at some point after Dr. Godfried's assessment of Andrew.

coordinating with ACS, although other doctors at Schneider would contact ACS as well and, in many instances of suspected abuse, Schneider social workers would make the first contact with ACS. After examining Andrew, Dr. Jenssen, who, like Dr. Godfried, had examined dozens of children with osteomyelitis, agreed with Dr. Godfried and Dr. Barlev that osteomyelitis was a highly unlikely diagnosis. Nevertheless, because osteomyelitis had not been definitively ruled out, Dr. Jenssen directed that Andrew's blood tests be performed again for comparison to the original blood tests and that a "full SMAC" be performed.[6] The results, which came back the same evening, reflected that Andrew's white blood cell count had declined dramatically, and was then well within the reference (normal) range. In addition, Andrew's temperature was normal, and his sedimentation rate had decreased substantially. Dr. Jenssen also scheduled a CT scan, to be performed in addition to the skeletal survey and ophthalmologic exam, to determine whether there were additional injuries that needed to be treated.[7]

Based on the above evidence, I find that plaintiffs did not prove that Andrew suffered from osteomyelitis at the time of his injuries, or that an MRI would have revealed a bacterial infection of his radius. Although the residents who initially examined Andrew in the emergency room identified osteomyelitis as a potential diagnosis, all of the treating doctors who examined Andrew and/or his x-rays and the results of other tests performed, concluded that there was only a low possibility that Andrew's fracture had been caused by osteomyelitis. It is undisputed that the presence of two fractures makes osteomyelitis an extremely unlikely diagnosis. This fact, when combined with Andrew's low neutrophil levels and negative blood cultures, support the conclusion that Andrew's fracture was not caused by osteomyelitis.

Dr. Wolpin's testimony, which provided the only medical opinion that Andrew's fracture was caused by osteomyelitis, was not persuasive. Dr. Wolpin found only one fracture, despite overwhelming evidence of two. (Like the other doctors, Dr. Wolpin agreed that, if there were two fractures present, osteomyelitis would be a highly unlikely diagnosis.) He also dismissed, with insufficient explanation, the blood sample and blood culture evidence, which contradicted a finding of osteomyelitis. And finally, after reviewing Andrew's final x-ray, which occurred on January 19, 2005 [8] and reflected a completely, normally healed bone, Dr. Wolpin explained that Andrew's osteomyelitis spontaneously resolved without any treatment or ill effect—an explanation that, based on the evidence, I find incredible.[9] Although Dr. Wolpin

---

6. A SMAC is a blood test that reflects levels of electrolytes, calcium, liver function, and alkaline phosphatase and is designed to reveal metabolic or bone disease.

7. In approximately 30% of infants, less than a year of age, with suspicious injuries, there are present intracranial injuries that need to be treated. A CT scan would reflect such injuries.

8. Andrew also had an x-ray taken on December 15, which reflected a porous space in Andrew's radius, possibly suggesting osteomyelitis. Dr. Godfried therefore consulted Dr.

Barlev, who opined that this was likely a part of the normal healing process. Dr. Barlev's opinion was confirmed by the January 19 x-ray.

9. There was evidence that in late October and early November 2004, prior to being admitted to Schneider, Andrew received antibiotic treatment for an upper respiratory infection and ear infection, respectively. These antibiotics were of a far more mild variety than the antibiotic treatment that would be used to treat osteomyelitis. Plaintiffs suggest that the earlier antibiotics played some role in the "spontaneous" resolution of Andrew's alleged

suggested that defendants' medical testimony may have been the product of *post hoc* coordination, the testimony of Drs. Barlev, Godfried, and Jenssen was entirely credible and consistent with the contemporaneous medical records. In short, Dr. Wolpin's testimony was insufficient to overcome the overwhelming evidence that Andrew's fractures were not the result of osteomyelitis.

### The Removal of Infant Plaintiffs

After Dr. Jenssen examined Andrew, she met with Dr. Barlev and Dr. Godfried, in addition to Schneider social worker Cristin Gilleran, to discuss the potential of abuse. After examining the evidence—including a fracture that was unusual for a child of Andrew's age, the fact that Adult Plaintiffs had no explanation for the fracture, the fact that Andrew was non-verbal and unable to explain the injury himself, and the 7 to 10 day delay in seeking treatment—the decision was made to report the case to the State Central Registry.[10]

At Dr. Jenssen's direction, Ms. Gilleran filed the Report of Suspected Child Abuse or Maltreatment to the State Central Registry. The report was transmitted to ACS, which commenced an investigation. Rasheda Goodwine was the ACS caseworker who was responsible for gathering the initial information for the investigation. Ms. Goodwine first spoke to Dr. Jenssen, who reported the above-mentioned reasons for her suspicions and, in addition, told Ms. Goodwine that Andrew could not have injured himself in a simple household fall, *i.e.*, a fall in which he fell only the distance of his own height or from a short distance, such as off a couch.[11] She did not, however, suggest that Andrew could not have been injured by falling from a greater distance. She did not express an opinion as to whether Andrew was being abused, nor did she express any opinion as to whether ACS should file a petition to have Andrew or his siblings removed from Adult Plaintiffs' household.[12]

Although Ms. Goodwine testified that she remembered Dr. Jenssen saying that Andrew's injuries were consistent with him being "grabbed and shaken," I find that Dr. Jenssen never used this term. Dr. Jenssen testified credibly that she never used this phrase, and her testimony was

---

osteomyelitis, despite the fact that the antibiotics were not the type of antibiotics used in cases of osteomyelitis and despite the fact that they were not administered in the same way as would antibiotics used in treating osteomyelitis. I reject this argument.

10. Certain professionals, including school officials, physicians and police officers, are required to report to the State Central Registry when "they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child." New York Social Services Law § 413(1). They do so by filling out a Form 2221A "Report of Suspected Child Abuse or Maltreatment" and submitting it to the New York State Office of Children and Family Services, which maintains the State Central Registry.

11. At trial, plaintiffs offered several prior, unrelated cases in which Dr. Jenssen's diagnoses of child abuse were questioned or criticized by a court. I denied their admission. After reviewing these decisions in light of the testimony in this trial, I find that, even if these prior judgments were admissible, they would have no effect on my findings of fact or conclusions of law.

12. Plaintiffs repeatedly assert that Dr. Jenssen stated to ACS that Andrew's injuries could not have been accidental. I find, however, that Dr. Jenssen made no such statement. Dr. Jenssen testified credibly, and consistently with contemporaneous records, that she informed ACS that Andrew did not have enough body mass for the fractures to be the result of a simple household fall from only his body height. Plaintiffs also repeatedly assert that Dr. Jenssen withheld exculpatory evidence from ACS. There is likewise no evidence to support this assertion. Indeed, Ms. Goodwine testified that she reviewed Andrew's medical file, including Dr. Jenssen's notes.

consistent with the interview she gave to ACS attorney Margaret Hunt, in September 2005, when she informed Ms. Hunt that she never used the phrase "grabbed and shaken," and that she thought the injury could have occurred by someone dropping the child. Nothing in Andrew's medical file, including Dr. Jenssen's consultation notes, ever uses this term or describes any potential cause of Andrew's injuries for which this phrase would be appropriate.[13] Instead, after observing Ms. Goodwine's testimony, I find that her progress notes, recorded over a week and a half after her actual interview of Dr. Jenssen, reflect either a misunderstanding or misinterpretation of Dr. Jenssen's statements.[14]

Other ACS caseworkers interviewed plaintiff Antoine at LIJ and conducted a home visit to interview plaintiff Estiverne and Andrew's siblings. Nothing in the skeletal survey, ophthalmologic exam, or CT scan, or from the caseworkers' interviews, was indicative of abuse. On November 30, 2004, ACS initiated a social hold on Andrew,[15] and on December 1, 2004, it filed a petition for the removal of all Infant Plaintiffs, which the Family Court granted on the same day. The decision to file the petition for removal was made solely by ACS supervisors, in conjunction with ACS's legal department. No one at Schneider played any role in that decision, other than to provide medical opinions.

On December 1, after Andrew's CT scan and his second-to-last blood culture both came back negative,[16] he was discharged to ACS's custody. Subsequent to Andrew's discharge from Schneider, Infant Plaintiffs were placed in the care of maternal relatives, where they stayed until May 4, 2005. They were then moved to a foster home, where they resided until September 16, 2005. At that point, after completing a full investigation, ACS withdrew its petition, and Infant Plaintiffs were returned to Adult Plaintiffs' home. Adult Plaintiffs testified credibly that Infant Plaintiffs' removal caused substantial disruption to the family's home and religious lives, and had a particularly devastating effect on Ms. Antoine.[17]

13. The phrase "grabbed and shaken" is strikingly similar to the phrase "shaken baby syndrome," which is a medical diagnosis associated with specific physiological symptoms and is not related to Ms. Goodwine's understanding of the phrase "grabbed and shaken" as "grab[ing a] child by [ ] the hand or [ ] the wrist and [ ] making a jerking motion." It is highly unlikely that an experienced pediatrician specifically trained in the area of child abuse would use this colloquial phrase to describe the cause of a child's injuries when the phrase is so similar to a serious medical diagnosis with symptoms completely unrelated to those found in Andrew. Nothing in the medical record or any doctor's testimony suggests shaken baby syndrome.

14. Ms. Goodwine's progress notes contain several additional, acknowledged misstatements.

15. Under New York law:
a designated employee . . . of social services . . . shall take all appropriate measures to protect a child's life and health including . . . taking or keeping a child in protective custody without the consent of a parent or guardian if such person has reasonable cause to believe that the circumstances . . . are such that continuing in his or her place of residence . . . presents an imminent danger to the child's life or health.
New York Social Services Law § 417.

16. A patient can be discharged after the fourth round of blood culture testing because, at that point, if the culture remains negative, it is highly unlikely that the result will change.

17. Because, as discussed below, defendants are not liable for the removal of Infant Plaintiffs from Adult Plaintiffs' home, a detailed discussion of the damages suffered by plaintiffs will not be undertaken.

442

## Conclusions of Law

### Plaintiffs Federal Constitutional Claims Under § 1983—State Action and Employer Liability

Plaintiffs' constitutional claims, brought under § 1983, rest on two grounds: (1) that Hospital Defendants violated Andrew's Fourth Amendment rights when they performed a variety of tests during his stay at LIJ, which plaintiffs allege were purely for the purpose of investigating child abuse; and (2) that Dr. Jenssen violated Infant Plaintiffs' Fourth and Fourteenth Amendment rights, and Adult Plaintiffs' Fourteenth Amendment rights, when she allegedly conspired with ACS to deprive Adult Plaintiffs of their custody of Infant Plaintiffs on the basis of insufficient evidence. Plaintiffs claim also that defendant LIJ is responsible for the actions of Dr. Jenssen under the standard set forth in *Monell v. Dept. of Social Serv. of the City of N.Y.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because I find that plaintiffs have not shown, as a threshold matter, that any defendant acted under the color of state law, I need not reach the substance of plaintiffs' claims.

■ "Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *K & A Radiologic Tech. Servs. Inc. v. Comm'r of the Dept. of Health*, 189 F.3d 273, 280 (2d Cir.1999) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). When a private hospital admits and performs tests on a child for medical reasons, the hospital is not subject to liability under § 1983, even if concerns of abuse partially inform the decision. *See Kia P. v. McIntyre*, 235 F.3d

749, 756–57 (2d Cir.2000). However, once a child is no longer being held for any medical treatment, and a hospital continues to detain and test the child for purely investigatory reasons, the hospital itself becomes a part of the "reporting and enforcement machinery" of ACS and is subject to § 1983 liability. *Id.*

■ In addition, a private entity may be liable under § 1983 if it is a "willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Mere cooperation with a state official or investigatory agency is insufficient to establish state action. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998); *San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246, 252, 256 (2d Cir.1984). Rather, to prove joint activity, a plaintiff must show: "(1) an agreement between ... a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999).

■ Finally, LIJ is potentially liable for the actions of its doctors under certain circumstances. Like government employers, private employers who are found to be state actors are not responsible, under a theory of *respondeat superior*, for the constitutional torts of their employees. Rather, plaintiffs must show that " 'action pursuant to official ... *policy* of some nature caused a constitutional tort.' " *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir.1990) (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018) (emphasis in the original). A plaintiff need not establish that an official hospital policy caused the deprivation of constitutional rights, but rather, under § 1983, employer liability may be imposed for a single decision by a policymaker.[18] *See Pembaur v. City of*

18. Plaintiffs originally claimed that LIJ's formal hospital policy regarding child abuse was a cause of the deprivation of their constitu-

tional rights under *Monell.* For the reasons stated in the court's opinion on summary

*Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Although official employer policy often takes the form of formal rules and understandings, employers "frequently choose[ ] a course of action tailored to a particular situation[,] and ... [i]f the decision to adopt that particular course of action is properly made by that [employer]'s authorized decisionmakers, it surely represents an act of official government policy...." *Id.* All that is required is that the policymaker in question has final authority to establish policy.

### State action with regard to the detention and testing of Andrew at Schneider

▮ I find that all of the tests performed on Andrew during his stay at Schneider were motivated by at least a partial medical purpose. As discussed above, it is standard practice, when a child under the age of one presents with an unexplained fracture, to check for other potentially undetected injuries. The skeletal survey, for instance, could have revealed additional fractures that Adult Plaintiffs may not have noticed and which may have required treatment. Likewise, the CT scan and ophthalmologic exams would have revealed whether Andrew had any bleeding of the brain or rupturing of blood vessels in the eyes, respectively; either of these could have necessitated medical treatment. Whether or not the doctors had suspicions of additional injuries arising from their suspicions of abuse, and even if rooting out suspected abuse partially informed their decision to perform the additional testing, the tests were necessary to determine whether Andrew needed any further medical treatment.

Therefore, LIJ is not a state actor for purposes of Andrew's stay at Schneider or the testing performed on him while he was in the hospital's care.[19]

### State action with regard to ACS's petition for court-ordered removal

### *Whether Hospital Defendants are liable for the actions of Dr. Jenssen in an alleged conspiracy with ACS*

Plaintiffs argue that, with regard to the removal of Infant Plaintiffs from Adult Plaintiffs' home, LIJ is liable for the actions of Dr. Jenssen because Dr. Jenssen was a policymaker with regard to LIJ's policy on suspected child abuse or neglect.

▮ The evidence did not support plaintiffs' position. Although she was the head of the Child Protection Consultation Team, Dr. Jenssen's role on that team was merely to coordinate and convene the relevant doctors and to work with that team to coordinate a course of action going forward. In this capacity, she often spoke to ACS, but the evidence showed that she was rarely, if ever, the only doctor to speak to ACS; other doctors could contact ACS without her permission or knowledge; and she had no control over whether other doctors reported to the Central Registry a suspicion of abuse. Most importantly, there was no evidence that Dr. Jenssen ever promulgated, or indeed, had any input at all, in hospital policy as it pertained to cases of suspected abuse.

LIJ, therefore, cannot be liable, under § 1983, for the actions of Dr. Jenssen.

judgment, however, that assertion is untenable. *See Estiverne v. Esernio–Jenssen,* 833 F.Supp.2d 356, 369 (E.D.N.Y.2011).

**19.** Even plaintiffs' expert, Dr. Martin Wolpin, agreed that, because blood cultures had been

procured to assess Andrew for possible osteomyelitis, it was entirely appropriate to admit Andrew to the hospital for at least 72 to 96 hours.

444

### Dr. Jenssen's liability for the court-ordered removal of Infant Plaintiffs

Plaintiffs argue that Dr. Jenssen was a state actor with regard to Infant Plaintiffs' court ordered removal because she was a joint conspirator with, or as they now put it, "entwined with," ACS in the decision to petition for removal.

■ Plaintiffs have not proved that Dr. Jenssen played any role—other than to provide her medical opinion—in the decision to file a petition for removal. The uncontroverted testimony reflected that senior ACS caseworkers, after consulting ACS's legal department, made the decision to file for removal of Infant Plaintiffs. ACS conducted its own investigation, however limited it may have been in this case. Dr. Jenssen's cooperation in the ACS investigation, by providing medical information and opinion, does not transform her into a state actor.[20] As the evidence established, Dr. Jenssen expressed no opinion as to the course of action that ACS should pursue, and ACS never directed or requested that Dr. Jenssen perform any testing on Andrew. ACS had within its purview several options short of removing Infant Plaintiffs from Adult Plaintiffs' home. The decision to seek removal was the sole province of ACS. Although Ms. Goodwine testified at her deposition that ACS made the decision to file for removal "in unison" with the Schneider Child Protection Consultation Team, based upon all of the credible evidence, I find that this statement merely references the fact that Dr. Jenssen, and other doctors at Schneider, provided medical information to ACS. Therefore, Dr. Jenssen is not a state actor

for purposes of Infant Plaintiffs' removal from Adult Plaintiffs' home.[21] *See San Filippo*, 737 F.2d at 256 (dismissing § 1983 claims against private citizens alleged to have conspired with a district attorney because the evidence did no more than show that the citizens cooperated in the D.A.'s investigation).

Finally, Plaintiffs now argue, for the first time in their post-trial memorandum, that Dr. Jenssen is a state actor because she was sufficiently "entwined" with ACS. *See Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir.2012) (stating that a private entity may be liable under § 1983 if its functions are "so entwined with governmental policies" that its actions can fairly be regarded as governmental in nature). Plaintiffs argue that, because Dr. Jenssen worked extensively with ACS and New York City law enforcement authorities at the Queens Child Advocacy Center ("CAC"), Schneider and Dr. Jenssen are state actors for purposes of Infant Plaintiffs' removal. But the CAC has no involvement in this case. Neither Schneider's nor Dr. Jenssen's involvement at the CAC had any relationship to the decision to admit Andrew to Schneider, to test Andrew while he was there, or to file a Family Court petition for Infant Plaintiffs' removal. Therefore, this argument is rejected.

### Plaintiffs' Claims Under New York State Law

Plaintiffs bring claims against the Hospital Defendants, under New York state law, for medical malpractice and gross negligence. Although the standards for these claims differ slightly, because I re-

---

**20.** Contrary to plaintiffs' suggestion in their memorandum that Dr. Jenssen told ACS that Andrew had been abused, the uncontradicted testimony of Ms. Goodwine was that Dr. Jenssen never said that it was her opinion that the children were abused.

**21.** This finding applies to both the Fourth Amendment claims and the Fourteenth Amendment claims that are based on Infant Plaintiffs' removal.

ject them both for the same reasons, they will be treated together below.

■ Under New York law, to prove medical malpractice, a plaintiff must show that a defendant deviated from accepted medical practice and that the alleged deviation proximately caused injury or death. *Bacani v. Rosenberg*, 74 A.D.3d 500, 501, 903 N.Y.S.2d 30 (1st Dep't 2010). Proving gross negligence requires a showing of "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Colnaghi, USA. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–24, 595 N.Y.S.2d 381, 611 N.E.2d 282 (N.Y.1993). Plaintiffs argue that Dr. Jenssen and Schneider committed malpractice and were grossly negligent because an MRI was not performed on Andrew and that this failure proximately caused Infant Plaintiffs' removal. Their position is that, had an MRI been conducted, osteomyelitis would have been diagnosed, and this would have provided an innocent explanation for Andrew's injuries. Plaintiffs also claim that Dr. Jenssen "overrul[ed] the specialists in her hospital."

■ Cancelling and/or failing to perform the MRI constituted neither negligence nor malpractice.[22] As discussed above, when Dr. Godfried and Dr. Jenssen reviewed Andrew's medical chart and notes on November 29, he had no fever, and the specific white blood cells that would be elevated in cases of osteomyelitis, i.e., neutrophils, were well within the reference range, and, when expressed as a

percentage of white blood cells, were below the range.[23] Likewise, his blood cultures revealed no bacteria in the blood. Moreover, the presence of two fractures made osteomyelitis highly unlikely, as osteomyelitis rarely occurs in two separate bones. Contrary to plaintiffs' assertion, Dr. Jenssen never overruled any other doctor. After Andrew's initial examination, the doctors in the emergency room expressed the view that osteomyelitis should be ruled out, which it was.

Finally, between November 27, the date of Andrew's first blood test, and November 29, the date of his second blood test, Andrew's temperature, his white blood cell count (and specifically his neutrophil count), and his sedimentation rate all decreased. Although both parties' witnesses agreed that spontaneous resolution, i.e., healing in the absence of treatment, was *possible* in cases of osteomyelitis, it was not a likely scenario.[24] Therefore, plaintiffs have failed to prove by a preponderance of the evidence that defendants either were negligent or deviated from accepted medical practice by not performing an MRI. In addition, even if it could be construed as deviation from accepted medical practice to not perform the MRI as soon as the emergency room doctor had a suspicion of osteomyelitis, plaintiffs' claims would fail for the simple fact that, as I found above, Andrew did not have osteomyelitis. Therefore the failure to perform an MRI could not have proximately caused Infant Plaintiffs' removal from Adult Plaintiffs' custody.

22. As found above, it is unclear whether the MRI was ever in fact scheduled. However, whether it was scheduled and cancelled, or never scheduled at all, at bottom, plaintiffs' claim is that the failure to perform the MRI creates liability.

23. When blood sample results are returned, each type of neutrophil is assigned both an absolute number and a number expressed as

a percentage of white blood cells. On both blood sample reports, every measure of neutrophil levels was within or below the reference range.

24. Indeed, Dr. Godfried testified credibly that, in any case of spontaneous healing, there would form a "Brodie's Abscess," which was not found in Andrew's final x-rays.

## CONCLUSION

In sum, plaintiffs have failed to prove state action by any of the defendants. In addition, they have failed to prove that Dr. Jenssen was a hospital policymaker for whose conduct LIJ could be held liable. For these reasons, the § 1983 claims must fail. Finally, plaintiffs have failed to prove either that Hospital Defendants were negligent or committed medical malpractice under New York state law because an MRI was not conducted on Andrew's wrist.

The Clerk of Court is therefore directed to enter judgment in favor of defendants.[25]

**SO ORDERED.**

**25.** Defendants also filed a motion for partial findings under Federal Rule of Civil Procedure 52(c). Because I find for defendants in my findings and conclusions under Rule 52(a), defendants' Rule 52(c) motion is denied as moot.